UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|                           |   |                  |
|---------------------------|---|------------------|
|                           | ) |                  |
| UNITED STATES OF AMERICA, | ) |                  |
|                           | ) |                  |
|         Plaintiff,        | ) |                  |
|                           | ) | Criminal Action  |
| v.                        | ) | No. 14-10159     |
|                           | ) |                  |
| KHAIRULLOZHON MATANOV,    | ) |                  |
|                           | ) |                  |
|         Defendant.        | ) |                  |
|                           | ) |                  |


BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

DETAINMENT HEARING AND ARRAIGNMENT



John J. Moakley United States Courthouse
Courtroom No. 13
One Courthouse Way
Boston, Massachusetts  02210
Wednesday, June 4, 2014
11:05 a.m.



Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By: Scott Garland and Aloke Chakravarty,
3             Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
4         Suite 9200
          Boston, Massachusetts  02210
5         On Behalf of the Government

6         LAW OFFICE OF EDWARD L. HAYDEN
          By: Edward L. Hayden, Esq.
7         7 Franklin Street
          Lynn, Massachusetts  01902
8         On Behalf of the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

DIRECT   CROSS   REDIRECT   RECROSS

WITNESSES FOR THE
  GOVERNMENT:

TIMOTHY McELROY

    By Mr. Garland     5          54
    By Mr. Hayden         24

E X H I B I T S

| GOVERNMENT'S | DESCRIPTION | FOR ID | IN EVD. |
|---|---|---|---|
| 1 | MoneyGram receipt | | 13 |
| 2 | MoneyGram receipt | | 13 |
| 3 | Forensic accountant's summary | | 18 |
| 4 | MoneyGram Transactions sent 2010-2013 by sender and recipient | | 18 |
| 5 | MoneyGram Transactions sent 2010-2013 by recipient | | 18 |

DEFENDANT'S

| 1 | Transcript of interview | | 32 |
|---|---|---|---|

```
 1              THE CLERK:  All rise.

 2              (The Court enters the courtroom at 11:05 a.m.)

 3              THE COURT:  Please be seated.

 4              THE CLERK:  The United States District Court for the

 5  District of Massachusetts is now in session, the Honorable

 6  Marianne B. Bowler presiding.

 7              Today is Wednesday, June 4, 2014.  The case of United

 8  States of America v. Matanov, Criminal Action No. 14-10159,

 9  will now be heard.

10              Will counsel please identify themselves for the

11  record.

12              MR. GARLAND:  Good afternoon, your Honor.  Assistant

13  U.S. Attorney Scott Garland on behalf of the United States.

14              THE COURT:  Thank you.

15              MR. CHAKRAVARTY:  Also, Aloke Chakravarty, your Honor.

16              THE COURT:  Thank you very much.

17              MR. HAYDEN:  Good afternoon, your Honor.  Edward

18  Hayden for Mr. Matanov.

19              THE COURT:  Thank you very much.

20              And again, Mr. Hayden, I just want to be sure that

21  your client does not require the services of an interpreter.

22              MR. HAYDEN:  That is accurate, your Honor.

23              THE COURT:  All right.  Are we ready to proceed with

24  detention?

25              MR. GARLAND:  The government is, your Honor.
```

1          THE COURT:  Would you call your first witness, please.

2          MR. GARLAND:  Thank you.  The United States calls

3  Special Agent Tim McElroy, please.

4          THE COURT:  Would you please come forward and be

5  sworn.

6               TIMOTHY McELROY, duly sworn

7          THE COURT:  And I'll just ask you to sit forward and

8  microphone.

9          THE WITNESS:  Yes, your Honor.

10          THE CLERK:  Could you introduce yourself, spelling

11  your last name for the record.

12          THE WITNESS:  Certainly.  My name is Timothy McElroy.

13  My last name is M-C-E-L-R-O-Y.

14          MR. GARLAND:  May I proceed, your Honor?

15          THE COURT:  You may.

16                    DIRECT EXAMINATION

17  BY MR. GARLAND:

18  Q.   Special Agent McElroy, who do you work for?

19  A.   I'm currently employed by the FBI here in Boston,

20  Massachusetts.

21  Q.   How long have you been with the FBI?

22  A.   I've been with the FBI for the last 18 years.

23  Q.   And what types of cases do you investigate?

24  A.   Currently I'm assigned to the organized crime squad.  I've

25  been doing so for the past ten years, approximately.  Prior to

1    that I worked narcotics investigations, domestic terrorism

2    investigations, public corruption investigations and healthcare

3    fraud cases.

4    Q.    And who did you work for before working for the FBI?

5    A.    Before being employed with the FBI I was a special agent

6    with the Department of Justice, Office of the Inspector

7    General, in Washington, D.C.

8    Q.    Have you been involved in the investigation of the

9    defendant, Mr. Matanov?

10   A.    Yes, I have.

11   Q.    And what have your duties been?

12   A.    Primarily my duties were some spot-check surveillances,

13   which are commonly referred to as "drive-by surveillances,"

14   non-static surveillance, and recently I assisted with the

15   arrest of Mr. Matanov.

16   Q.    And are some of the things that you are about to testify

17   today, the basis of your knowledge, based on information that

18   you've gained from other agents involved in the investigation?

19   A.    Yes, they are.

20   Q.    Since you mentioned surveillance, I want to talk to you

21   about the April and May time period of 2013.  Was Mr. Matanov

22   under surveillance by the FBI and others during that period?

23   A.    Yes, he was.

24   Q.    And how was that surveillance conducted?

25   A.    It was conducted basically as a -- what we term a "bumper

1    lock surveillance," an overt surveillance.  The directives

2    given to the investigative team at the time was to make sure

3    that they stayed with Mr. Matanov and did not lose him.

4    Q.   And when you say that it was overt, what does that mean?

5    A.   That means Mr. Matanov was certainly aware of people

6    following him, cars following him, things of that nature.  It

7    was not covert in any manner.

8    Q.   The FBI wasn't trying to hide that it was surveilling him

9    at that time?

10   A.   That's correct.

11   Q.   Did Mr. Matanov appear to recognize that he was being

12   trailed by the FBI?

13   A.   Yes, he did.

14   Q.   How do you know that?

15   A.   I know that from review of two separate FD-302s, the forms

16   on which we write reports on.  One of those was dated May 9,

17   2013, where Mr. Matanov was surveilled to downtown Boston, and

18   he was followed to the Boston University Dental Service.  When

19   he was there he approached one of the surveillance agents and

20   began to basically talk to the agent, identifying himself and

21   asking him just basic questions.

22   Q.   Did he exhibit any other behavior that suggested that he

23   was aware that he was being followed?

24   A.   Yes.  Approximately ten days later, on May 19, 2013, he

25   was -- Mr. Matanov was under surveillance again, and the

1    surveillance team noticed that on several different occasions

2    throughout the day that Mr. Matanov was making some evasive

3    driving styles.  He was making sharp turns, traveling in an

4    erratic manner on the expressway, going through different lanes

5    of traffic quickly, things that were obviously a sign of

6    concern to the surveillance personnel at the time for public

7    safety and other reasons.

8    Q.   Did anybody from the government contact Mr. Matanov either

9    directly or through his attorney at the time about this?

10   A.   Yes.  It's my understanding that Mr. Matanov was contacted

11   through his attorney.  I believe his attorney at the time was a

12   Mr. Glickman.  And the government advised Mr. Glickman to

13   please pass along to Mr. Matanov to obey the traffic laws of

14   the Commonwealth and to be careful when driving for obvious

15   concerns, civilian population and law enforcement and

16   Mr. Matanov himself.

17   Q.   To be fair to Mr. Matanov, did he appear to follow that

18   direction, or follow that advice?

19   A.   As far as I'm aware, yes, he complied with all of those

20   terms.

21   Q.   I'm going to talk to you next about July 4th of 2013.  Did

22   a similar call go out from the government to Mr. Matanov's

23   attorney about July 4th, in advance of July 4th?

24   A.   Yes, that's true.  According to the information given to

25   me, Mr. Matanov's attorney was advised by the U.S. Attorney's

1    Office that Mr. Matanov would be under surveillance and to make

2    certain that Mr. Matanov, to the best of his knowledge or

3    approach, could stay away from the July 4th celebration

4    happening in the city of Boston.

5        For obvious reasons, the city was on edge following the

6    marathon bombings.  Law enforcement was extremely tight and

7    concerned with any sort of potential issue for anybody.  And

8    the government, through the U.S. Attorney's Office, requested

9    Mr. Matanov to stay clear of the July 4th celebration.

10   Q.   And again to be fair to Mr. Matanov, did he appear to stay

11   away from Boston on July 4th of last year?

12   A.   Yes, he did.

13   Q.   Did a similar call go out to Mr. Matanov's attorney

14   concerning Patriot's Day of this year, 2014, asking him to stay

15   outside of Boston on that date as well because of -- or at

16   least making him aware that he'd be under a lot of surveillance

17   at that time?

18   A.   It's my understanding that, yes, that happened.

19   Q.   And did he again obey -- not obey that, but did he stay

20   away from Patriot's Day in Boston at that time?

21   A.   Yes, he did.

22   Q.   I want to now talk to you about Mr. Matanov's ties to the

23   community or lack thereof.  To your knowledge, is Mr. Matanov a

24   citizen of the United States?

25   A.   No, he's not a citizen.

1   Q.   Is he in the United States lawfully?

2   A.   It's my understanding, yes, he's here lawfully.  He's

3   considered a legal permanent resident.

4   Q.   To your knowledge, does Mr. Matanov have a job right now?

5   A.   Currently, right now, I do not believe he has a job.  He

6   was employed as a cab driver until his arrest last Friday.

7   Q.   And have FBI agents talked to Mr. Matanov's employer about

8   whether he has a job during the pendency of this case?

9   A.   It's my understanding that the employer of Mr. Matanov has

10  advised the government that Mr. Matanov does not have a job as

11  of today and will not have a job with his company until this

12  case is adjudicated.

13  Q.   Has the FBI checked whether Mr. Matanov owns any real

14  property in the Commonwealth of Massachusetts?

15  A.   Yes, the investigative team has checked that out.

16  Q.   And what did they learn?

17  A.   They could find no real property or anything -- any assets

18  owned by Mr. Matanov here in the United States or locally.

19  Q.   What's your understanding of his living situation?

20  A.   My understanding of his living situation was that he was a

21  month-to-month lessee, or renter, of an apartment in Quincy,

22  Massachusetts.

23  Q.   To your knowledge does he live there alone or does he have

24  a roommate?

25  A.   It's my understanding that he has a roommate.

1    Q.    And to your knowledge do they share the rent?

2    A.    They split the rent, yes.

3    Q.    Did the FBI look into whether Mr. Matanov owns a car?

4    A.    Yes, we did.

5    Q.    What did they find?

6    A.    There was no ownership of any sort of vehicle.

7    Mr. Matanov had leased a cab for purposes of his employment,

8    and as far as we know that's the only access he has to a

9    vehicle.

10   Q.    I want to now talk to you about financial transactions

11   between Mr. Matanov and other people.  The Court heard last

12   Friday that Mr. Matanov has no family in the United States but

13   does have family outside the United States.  Has the FBI done

14   any investigation into whether Mr. Matanov has conducted

15   financial transactions between himself and people outside the

16   United States?

17   A.    Yes, we have.

18   Q.    And was there evidence that he had engaged in such

19   transactions?

20   A.    Yes, there is.

21        MR. GARLAND:  Your Honor, may I approach the witness

22   with a couple of exhibits?

23        THE COURT:  You may.  And you need not ask again.

24        MR. GARLAND:  Thank you, your Honor.

25   BY MR. GARLAND:

1   Q.   Special Agent McElroy, I've just handed you what's been

2   marked Exhibit No. 1 and Exhibit No. 2.  Do you have those in

3   front of you?

4   A.   Yes, I do.

5   Q.   Do you recognize them?

6   A.   Yes, I do.

7   Q.   What do they appear to be?

8   A.   They appear to be MoneyGram remitter forms.

9   Q.   And what do you understand MoneyGram to be?

10  A.   It's my understanding that MoneyGram is a money-remitting

11  company similar to that of Western Union and Green Dot,

12  companies like that, where individuals can come to a MoneyGram

13  location and send money domestically and internationally.  Many

14  times it's used by persons who don't have bank accounts.

15  Q.   And what on this form would convey to MoneyGram where

16  money would be sent from and to?

17  A.   For these types of forms you'll have a sender section,

18  which is on the top of this Exhibit No. 1.  In the center

19  information is provided, or asked for, a full name -- a first

20  name, a maiden name, a last name, an address, things like that.

21  And then underneath that is the amount to be sent -- in Block

22  No. 2 how much money is to be sent to the recipient.

23       And then the second -- or the third -- excuse me -- the

24  third spot there is called "receiver" or recipient of the

25  money.  And a person's name is written in this form as a

1  receiver -- potential receiver of certain monies.

2  Q.   Where were Exhibits No. 1 and No. 2, or at least the

3  originals, of which these were copied, found?

4  A.   It's my understanding that these two MoneyGram form

5  receipts were located in Mr. Matanov's -- in his apartment, in

6  his bedroom, located inside his bedroom closet inside a

7  luggage -- a piece of luggage.  And that was pursuant to a

8  search of Mr. Matanov's apartment.  And that was a consent

9  search given by Mr. Matanov.

10 Q.   You mentioned before that Mr. Matanov has a -- has or had

11 a roommate.  Did Mr. Matanov and the roommate share a bedroom

12 or did they have separate bedrooms?

13 A.   It's my understanding they had separate bedrooms.

14      MR. GARLAND:  Your Honor, I move to admit Exhibits 1

15 and 2 into evidence.

16      MR. HAYDEN:  No objection.

17      THE COURT:  All right.  Government Exhibits 1 and 2

18 will be made part of the record for the purpose of this

19 hearing.

20      (Government Exhibit Nos. 1 and 2 received into

21 evidence.)

22 BY MR. GARLAND:

23 Q.   Did the FBI obtain any records from MoneyGram to see

24 whether Mr. Matanov had actually sent any funds overseas?

25 A.   Yes, we did.

1    Q.    What was the process by which they did that?

2    A.    The process by which that occurred was subpoena requests

3    were sent out for records through MoneyGram and any other

4    money-remitting agency similar to Western Union, Green Dot and

5    the like, for any transactions relative to Mr. Matanov.  When

6    those records were received by the government, an additional

7    request went out for information pertaining to the recipients

8    of the monies that were sent by Mr. Matanov outside of the

9    United States.

10   Q.    And did MoneyGram respond with any records that fit those

11   requests?

12   A.    Yes, they did.

13   Q.    When they obtained records from MoneyGram showing that

14   other people had sent information -- money to people who had

15   already received information --

16          THE COURT:  Can we have approximate dates so we can

17   set this in time?

18          MR. GARLAND:  Yes.

19   BY MR. GARLAND:

20   Q.    Over what dates were the records gathered?

21   A.    Sure.  They were between the years 2010 and 2013,

22   approximately.

23          THE COURT:  Thank you.

24   Q.    Did MoneyGram send records that indicated Mr. Matanov had

25   sent money to people overseas?

1   A.   Yes, they did.

2   Q.   And did they respond with records showing that other

3   people, or at least other names, had been used to send money to

4   those same recipients over the same periods?

5   A.   Yes.

6   Q.   Did the FBI attempt to determine whether any of the names

7   that had been used to send -- other names that had been used to

8   send money to those recipients were linked to Mr. Matanov

9   himself?

10   A.   Yes, we did.

11   Q.   How did they do so?

12   A.   The investigative team did so through checks of

13   public-source databases, things like the Registry of Motor

14   Vehicles here in the Commonwealth, the U.S. Postal Service to

15   try to verify addressees; the Customs and Border Patrol,

16   crossings, any sort of entry into the United States; and the

17   use of ACCRA and those types of databases to try to identify if

18   the persons listed were actual persons or just aliases.

19   Q.   Did they try to crosscheck any of the addresses or

20   telephone numbers or places from which the money had been sent

21   in those other names correlated to addresses, phone numbers,

22   and the like that Mr. Matanov had used?

23   A.   Yes, they did.

24   Q.   Did they find commonalities?

25   A.   Yes, they did.

1  Q.   Did they check those other names to see whether those

2  names belonged to people who were real people within the

3  Commonwealth of Massachusetts?

4  A.   Yes, they did.

5  Q.   What did they find?

6  A.   They could not find any sort of reference to the named

7  individuals as being people; it appeared that those -- the

8  names listed were simply aliases, fictitious names.

9  Q.   And what sort of commonalities did they find in the

10  biographical details or the contact information among those

11  other names and Mr. Matanov?

12  A.   Well, the certain commonalities again were addressees that

13  were listed that were very similar or close to Mr. Matanov's

14  addressees listed here in the local Boston area.

15          THE COURT:  Addressees?

16          THE WITNESS:  Excuse me.  Addressees.

17          And they were listed through -- there were similar

18  telephone numbers as well listed on some of the recipients and

19  addressees that ties back to Mr. Matanov.

20  BY MR. GARLAND:

21  Q.   Did anybody at the FBI summarize these records that they

22  had received documenting transactions between Mr. Matanov and

23  people outside the United States as well as money that had been

24  sent to people outside of the United States using aliases that

25  they traced to Mr. Matanov?

1    A.    Yes.

2    Q.    I'm approaching you with what's previously been marked as

3    Exhibits 3 through 5 and have been provided to the Court and

4    defense counsel.

5           THE COURT:  Are you moving to admit 1 through 2?

6           MR. GARLAND:  Yes, your Honor.  1 and 2 I ask be

7    admitted.

8           THE COURT:  No objection.

9           MR. HAYDEN:  No objection.

10          THE COURT:  All right.  For the record.

11   BY MR. GARLAND:

12   Q.    Do you recognize Exhibits 3 through 5?

13   A.    Yes, I do.

14   Q.    What are they?

15   A.    Those are the charts that were put together by forensic

16   accountant Lindsay Zimmerman with the FBI detailing the various

17   MoneyGram transactions conducted by Mr. Matanov between the

18   years 2010 and 2013.

19   Q.    If you could refer back to Exhibit No. 1, what is the

20   sender name on the MoneyGram slip that was found on -- on this

21   MoneyGram slip that was found in Mr. Matanov's closet?

22   A.    The name listed was Ali Hasan.

23   Q.    On Exhibit 3, do you see Ali Hasan listed as a sender?

24   A.    Yes.

25   Q.    What's the name that's listed on Exhibit No. 1 as the

1   receiver of those funds?

2   A.    Forgive me for the pronunciation.  The first name is

3   Kamoliodin; the last name is Nitazaliev.

4   Q.    And on Exhibit No. 2 is the name of the receiver Normatov

5   Mukhammadali?

6   A.    Yes.

7   Q.    And do you see those last two names that we discussed, the

8   Nitazaliev and the Mukhammadali names, showing up in the record

9   summarized by the forensic accountant in Exhibit 3?

10  A.    Yes.

11          MR. GARLAND:  Your Honor, I move to admit Exhibits 3

12  through 5 as evidence in this proceedings.

13          MR. HAYDEN:  No objection, your Honor.

14          THE COURT:  All right.  Government's Exhibits 3

15  through 5 are made part of the record for purposes of this

16  hearing.

17          (Exhibit Nos. 3, 4 and 5 received into evidence.)

18  BY MR. GARLAND:

19  Q.    If you could turn now to Exhibit No. 3.  What period of

20  time does this exhibit summarize records for MoneyGram?

21  A.    This summarizes records from MoneyGram between 2010 and

22  2013.

23  Q.    Looking at the first column, does it say at the top

24  "Sender Name, Recipient Location, Recipient Name"?

25  A.    Yes, it does.

1   Q.   And can you explain for the Court how this is organized in

2   Column 1?

3   A.   Yes.   In Column 1, again, it's listed as the sender name.

4   The first person would be the sender of the transaction -- the

5   MoneyGram transaction.   The recipient location is where the

6   money was sent to.   And then the third section is "recipient

7   name," so whoever received -- the name of the person who

8   received the transaction.

9        And going over to the right, the next column is the value,

10  or the amount of the transaction.   And then the last column is

11  the number of occurrences, which list transactions that went to

12  individual recipients.

13  Q.   So going back to Column No. 1, each of the names that were

14  traced to Mr. Matanov are, if I'm correct, in bold and in all

15  capital letters?

16  A.   That's correct.

17  Q.   And below that, the names that are not in boldface, those

18  are the recipients as well?

19  A.   That's correct.

20  Q.   And does it also list the countries to which the funds had

21  been transferred?

22  A.   That is correct.

23  Q.   How many total transactions were made either in

24  Mr. Matanov's name or in aliases traced to him?

25  A.   114 transactions.

1    Q.    Where is that listed on this spreadsheet?

2    A.    That is listed at the -- near the bottom on Column 3 where

3    it says "grand total."  The grand total starts on the left, the

4    grand total sum of transactions, the money figure, is

5    $71,385.91, and the number of occurrences is 114 transactions.

6    Q.    How much was sent in Mr. Matanov's own name?

7    A.    In his own name -- well, the total received by identified

8    family members, is that the request?

9    Q.    In fact, we'll get to that in a little bit when we get to,

10   I believe, Exhibit No. 5.  Let me ask you this:  Did the FBI

11   try to identify through this list whether any of these

12   recipients were members of Mr. Matanov's own family?

13   A.    Yes, they did.

14   Q.    And how did they do that?

15   A.    They did that by looking at the names, doing some research

16   and analysis on the names to try to identify if they're family

17   members or not of Mr. Matanov.

18   Q.    Is there a -- an entry or several entries here to somebody

19   with the name of Mataeva?

20   A.    Yes, there is.

21   Q.    I can see from -- has that been identified or indicated on

22   this spreadsheet as a member of Mr. Matanov's family, or a

23   probable member of his family?

24   A.    Yes, it is.

25   Q.    And why does the Mataeva surname correspond to a family

1   name of Mr. Matanov?

2   A.   It is my understanding that "Mataeva" is the feminine for

3   "Matanov" in Russian.

4   Q.   Since we are talking about a number of recipients and how

5   many recipients, if you could turn to Exhibit No. 5, please.

6       What do the shaded rows on this spreadsheet indicate in

7   the top portion?

8   A.   The shaded rows represent family members of Mr. Matanov.

9   Q.   And does Exhibit No. 5 essentially present the same

10  information as is on Exhibit No. 3 but summarized in grosser

11  detail?

12  A.   That's my understanding, yes.

13  Q.   If we can come back to Exhibit No. 5 -- actually, let's

14  stick with Exhibit No. 5 for a second.

15      On this spreadsheet, does it indicate the number of --

16  money that went to identified family members?

17  A.   Yes, it does.

18  Q.   How much and how many transactions?

19  A.   The total of identified family members -- or total number

20  of transactions was 93, and the amount of money that was

21  transferred was $56,590.41.

22  Q.   And how much money was found to be going to non-familiar

23  associates of Mr. Matanov?

24  A.   It was $14,795.50 over the course of 21 transactions.

25  Q.   In total, how many recipients of funds are there on this?

1   A.    There are 15 different recipients on this chart.

2   Q.    What does the second block of spreadsheet entries on

3   Exhibit No. 5 represent?

4   A.    The second block represents the various countries where

5   money was sent by Mr. Matanov to.

6   Q.    How many different countries did the money go to,

7   excluding the United States?

8   A.    Excluding the United States, it went to six different

9   countries.

10   Q.    If you would turn back to Exhibit No. 3.  Do you see a row

11   that starts out "Date Range - Potential False Names

12   Transactions"?

13   A.    Yes.

14   Q.    What does the information in that row and below that row

15   summarize?

16   A.    What it summarizes is the various date ranges between the

17   time in which aliases were used to send monies overseas

18   between, again -- starting at around September 2011 through

19   April 2013.

20   Q.    What does the first set of transactions represent, over

21   what date range and how many occurrences?

22   A.    The first date range is between September 22, 2011, and

23   November 13, 2011.  The amount was $2,495, and there were three

24   occurrences or transactions.

25   Q.    What was the next transaction done in a false name after

1    that November 13, 2011, transaction?

2    A.    That was July 7, 2012, for $890.

3    Q.    So there are no transactions between November of 2011 and

4    July of 2012?

5    A.    That's correct.

6    Q.    And when's the next transaction done in a false name after

7    July 7, 2012?

8    A.    The next transaction was September 4, 2012.

9    Q.    And how many -- and what's the next -- what's the range of

10   transactions starting then?

11   A.    The range is between September 4, 2012, through January

12   23, 2013, for a total of $12,098, which was transmitted over 15

13   different transactions.

14   Q.    So you just testified there is essentially a gap between

15   November of 2011 and July of 2012 in transactions done in a

16   false name.  Was there a significant event related to the

17   marathon bombings or the suspected bombers that occurred during

18   that period?

19   A.    Yes.

20   Q.    What was that?

21   A.    Tamerlan Tsarnaev traveled to the country of Dagestan

22   beginning in January 2012 through July of 2012.

23   Q.    Were there any transfers by Mr. Matanov in his name or in

24   false names, aliases, that were traced to him in April of 2013?

25   A.    Yes, there were.

1    Q.    When were those and how many transactions?

2    A.    The date range for those transactions were April 2nd,

3    2013, through April 18, 2013, for a total of $2,910 over four

4    transactions.

5    Q.    Did Mr. Matanov ever tell federal investigators how many

6    languages he speaks?

7    A.    It's my understanding, yes, he did.

8    Q.    And how many?

9    A.    Seven.

10             MR. GARLAND:  Your Honor, may I take a moment to

11   confer with counsel?

12             THE COURT:  You may.

13             (Counsel confer.)

14             MR. GARLAND:  No further questions at this time, your

15   Honor.

16             THE COURT:  Cross-examination, Mr. Hayden?

17                        CROSS-EXAMINATION

18   BY MR. HAYDEN:

19   Q.    You're familiar with the affidavit that was submitted with

20   the indictment?

21   A.    Yes, I am.

22   Q.    On Thursday, April 18th, at about 5:15 p.m., the FBI put

23   up the Tsarnaev brothers' photographs on their website?

24   A.    Yes.

25   Q.    At that time when they put the photographs up, did the FBI

1    have the name for those two brothers as being "Tsarnaev"?

2    A.   Not that I'm aware of.

3    Q.   And they didn't have their addresses?

4    A.   Not that I'm aware of, no.

5    Q.   Or their phone numbers?

6    A.   No.

7    Q.   On Friday, the 19th, at about 2 a.m. the FBI put more

8    photographs on their website?

9    A.   Yes.

10   Q.   Did they have the name of the Tsarnaev brothers at that

11   time?

12   A.   I'm not sure.

13   Q.   And so you're not sure whether or not they had their

14   addresses?

15   A.   I'm not sure.  I doubt that.  But, again, I'm not sure.

16   Q.   Fair enough.  And the same thing with the phone numbers?

17   A.   Correct.

18   Q.   At about eight o'clock in the morning on Friday, the 19th,

19   Mr. Matanov goes to the Braintree Police Station, agreed?

20   A.   I believe so.  I'd have to look at the document that

21   you're referring to.  If you have a copy of the indictment?

22   Q.   Sure.

23          THE COURT:  You may approach the witness, Mr. Hayden.

24          MR. HAYDEN:  Thank you, your Honor.  I should have

25   asked.

1    BY MR. HAYDEN:

2    Q.    Take your time and take a look at it.

3          (Pause.)

4    A.    So on Friday the 19th, right?

5    Q.    Correct.  Matanov goes to the Braintree Police Station?

6    A.    He does.  I don't know the time.  I don't see a time here

7    listed.  Is there a time listed?

8    Q.    Well, don't worry.  It was Friday morning, agreed?

9    A.    Agreed.

10   Q.    Okay.  And he spoke with a Detective Heslam.

11   A.    Again, I don't --

12   Q.    Okay.  I'll show you the transcript.

13         MR. HAYDEN:  May I approach, your Honor?

14         THE COURT:  You may, and you need not ask again.

15         THE WITNESS:  Thank you.

16   BY MR. HAYDEN:

17   Q.    You're looking at the transcript of the detective's

18   interview with Mr. Matanov, agreed?

19   A.    Yes.

20   Q.    And the detective in Braintree, that was his name,

21   Detective Heslam?

22         THE COURT:  Can we have a spelling, please?

23         THE WITNESS:  Yes, your Honor.  It says Matt Heslam,

24   M-A-T-T, last name H-E-S-L-A-M.

25         THE COURT:  Thank you.

BY MR. HAYDEN:

Q.   Now, when Mr. Matanov showed up at the Braintree Police Station, he gave his contact information to Detective Heslam?

A.   I'll take your word for it, sure.

Q.   Okay.  And at that time he told Detective Heslam the name of the bombers?

A.   Again, I haven't read this.  This is the first time I'm seeing this document, but I'll agree to that for sure.

Q.   Okay.  And he gave the Tsarnaevs' phone numbers to Detective Heslam?

A.   Let me -- yes, it looks like he gave at least -- yeah, one number, an 857 number.  Yes, it looks that way.  Yes.

Q.   And Matanov gave the detective the Tsarnaevs' address?

A.   Do you know where in this transcript it is, Counselor?

Q.   I probably highlighted it but --

A.   Okay.

        THE COURT:  Do you want to direct his attention?

        MR. HAYDEN:  Do you know what?  I don't have to -- I can withdraw that question just to...

BY MR. HAYDEN:

Q.   But in any event, this interview occurred on Friday morning?

A.   Yes.  April 19, 2013.

Q.   Approximately twelve hours before Dzhokhar was taken into custody?

1    A.    Yes.

2    Q.    At the end of the interview Detective Heslam says to

3    another Braintree police officer, "I got to call the FBI right

4    now."  And that's on page 18, Bates No. 18.

5    A.    Okay.  Yes, I see that.

6    Q.    You'll agree that's what Detective Heslam said?

7    A.    Yes.

8    Q.    And there's no indication in the transcript -- I mean,

9    that wasn't recorded, but is it safe to assume Heslam called

10   the FBI Friday morning?

11   A.    That's a safe assumption, yes.

12   Q.    And, again, there is no record of this, but it's a safe

13   assumption that Detective Heslam must have emphasized the

14   importance of the information he had?

15   A.    Yes.

16   Q.    And you'd agree with me that the FBI didn't interview

17   Matanov until Saturday afternoon?

18   A.    Again, I'm not sure of when that took place, Counselor,

19   but soon after.  Soon after.

20   Q.    Well, but the first interview with Matanov was Saturday

21   afternoon.

22   A.    Okay.

23              THE COURT:  He just testified he doesn't know.

24              MR. HAYDEN:  Oh, doesn't know.

25              THE WITNESS:  I've not seen -- do you have a 302 of

1   that or --

2   BY MR. HAYDEN:

3   Q.   I do.

4   A.   Okay.

5           THE COURT:   No federal tort claims, please.

6           (Laughter.)

7   BY MR. HAYDEN:

8   Q.   Actually, I'm showing you Bates No. 66.  If you would look

9   at the first page just to familiarize yourself with it.

10   A.   This -- okay.  This says the interview was on May 3rd.

11   Q.   No, I think -- if you look at page 66 --

12   A.   Okay.  I'm at Bates page 66.

13   Q.   At the very bottom I underlined it.

14   A.   Yes.

15   Q.   "I interviewed Matanov on Saturday, the 20th"?

16   A.   Yes, it says he, Mr. Matanov, was accompanied to the

17   Braintree Police Department, that's on the 19th, and then the

18   FBI contacted Matanov the next day.  That's what it says in

19   this.

20   Q.   Okay.  And when you're saying "May 3rd," I mean, that's

21   the date the report was written or something, right?

22   A.   Right.  Right.  Right.

23   Q.   So could we agree the FBI didn't interview Matanov until

24   at least 24 hours after he went to the Braintree police?

25   A.   Yes.

1   Q.   And in the affidavit for the indictment it says that

2   Matanov told Detective Heslam that he had not seen the Tsarnaev

3   photographs the previous night.  And that's on Paragraph 30 in

4   the affidavit for the indictment.

5   A.   The indictment itself?  You're referring to the

6   indictment?

7   Q.   The affidavit.  Paragraph 30.

8   A.   Paragraph 30.

9        THE COURT:  What are you -- are you referring to the

10  actual indictment?

11       MR. HAYDEN:  Well, the affidavit that accompanied it,

12  your Honor.

13       THE COURT:  Was there an affidavit?

14       MR. GARLAND:  Your Honor, no, it's a speaking

15  indictment, so...

16       THE COURT:  Exactly.  Exactly.

17  BY MR. HAYDEN:

18  Q.   All right.  Paragraph 30.

19  A.   Paragraph 30 of the indictment, the document that you

20  handed me, Paragraph 30?

21  Q.   Right.

22  A.   At the bottom of page 7?  Okay.

23  Q.   And that alleges that one of the things that Matanov

24  misled the detective was by saying that he had not seen the

25  Tsarnaev photographs the previous night?

1    A.    Correct.

2    Q.    But you'd agree with me that Matanov did say that he had

3    heard on the radio that morning that it was the Tsarnaevs?

4    A.    Where is that?

5    Q.    That's on the transcript, page 3.

6    A.    Back to the transcript?

7    Q.    Right.  Page 3.

8    A.    Page 3?  Bates stamp 9, right?

9    Q.    Pardon me?  It's not the Bates stamp.  It's just page 3 of

10   that transcript.

11   A.    Okay.  And you underlined it, I believe, Counselor, right,

12   I think?

13   Q.    All right.  Just to help you out.

14   A.    Would you like me to read it?

15   Q.    Well, I mean, he did say that he heard it and that's why

16   he ended up at the Braintree Police Station.

17            THE COURT:  Well, if you want him to read from a

18   specific section, point it out to him.

19   BY MR. HAYDEN:

20   Q.    Well, do you agree with me?

21   A.    I'll read it as it's transcribed here, and it's according

22   to Mr. Matanov.  It says, "So, then, like, I heard today in the

23   morning that, like, it was him and, actually, I didn't see that

24   it was theirs, the photos' last name.  I didn't see them.  And

25   then they -- they said, like, he got shot and he's dead.  And,

```
 1   like, I can't imagine that he did it, that kind of stuff.  And
 2   if anything I can help, like, to do, like I -- I am open to
 3   that."
 4           MR. GARLAND:  Your Honor, the government has no
 5   objection to the agent reading the transcript.  We would
 6   suggest, however, it should be an exhibit since so much
 7   information is coming out.
 8           THE COURT:  I'm going to suggest that, Mr. Garland.
 9           MR. HAYDEN:  I certainly would request it be admitted.
10           THE COURT:  All right.  It will be admitted as
11   Defendant's Exhibit 1 for the purpose of this hearing.
12           (Defendant's Exhibit No. 1 received into evidence.)
13   BY MR. HAYDEN:
14   Q.   Another basis for the indictment is that Matanov did not
15   say that he was a friend of Tamerlan Tsarnaev, agreed?
16   A.   I don't know, you know, the basis for --
17   Q.   Well, look at Paragraph 31 in the indictment.
18   A.   Paragraph 31?  Okay.
19   Q.   Okay.  You agree?
20           THE COURT:  Are you asking him whether it's a basis
21   for the indictment?
22   BY MR. HAYDEN:
23   Q.   That is what's written in Paragraph 31 of that indictment.
24           THE COURT:  That calls for a legal conclusion, so I'd
25   ask you to rephrase the question.
```

BY MR. HAYDEN:

Q.   In Paragraph 31 it says that "Matanov did not admit that he was friends with Tamerlan," agreed?

A.   What Paragraph 31 says is -- is it all right for me to read this?

THE COURT:  You may --

MR. HAYDEN:  Sure, sure.

THE WITNESS:  It says -- according to this Paragraph 31 on page 8 of the indictment handed to me, it said, "Matanov also told the detective that he mostly knew the Tsarnaevs through a common place of worship and through playing soccer, which Matanov intended to be false, misleading and to conceal the fact that Matanov was Tamerlan Tsarnaev's friend and had seen him twice that week on occasions unconnected with soccer or worship."

BY MR. HAYDEN:

Q.   Okay.  Now, in the transcript of the interview with Detective Heslam, Matanov does say that Tamerlan gave him boxing lessons, page -- Bates 14.

A.   Again --

Q.   You'd agree that he did say during that interview that Tamerlan gave him boxing lessons?

A.   Played soccer and boxed a little bit, trained, yes.

Q.   And that they went to a Golden Gloves boxing match in Lowell.

```
1    A.    Yes, that's what he said.

2    Q.    And you'd agree with me that Detective Heslam never asked

3    Matanov what his relationship was with Tamerlan?  And

4    calling your attention -- now, look at page 2 of that --

5    A.    Can I answer that?

6    Q.    -- transcript.

7          Go ahead.

8    A.    This is the first time I've seen this, so I have not read

9    this entire document, so I don't know exactly if he asked that

10   question or not, Counselor, about what his relationship with...

11   Q.    Look at page 2.  Just the second page, not a Bates number.

12   Just page 2.

13   A.    Okay.

14   Q.    Detective Heslam says, "He's the older brother, right?"

15   You get where I am?

16   A.    Yes.

17   Q.    And then Matanov says, "Yeah."  And then Heslam says,

18   "Okay."  And then Matanov continues with the relationship that

19   he has with Tamerlan, agreed?

20   A.    Agreed.

21   Q.    All right.  And then he gets cut off.

22   A.    Okay.

23   Q.    And Heslam doesn't go back to his relationship with

24   Tamerlan, does he?

25   A.    Well, again, right here on this page I don't see it, but I
```

1  have not read the entire document.  So if you would like me to

2  sit and try and read the whole --

3  Q.   Well, I don't want to waste the Court's time now, but it's

4  being admitted as an exhibit so it doesn't need to do that.

5       Okay.  On the first FBI interview on Saturday --

6  A.   Is this from the document?

7  Q.   This is on -- well, I'm sorry.  No.  On the -- I'm sorry.

8  Bates 22.

9  A.   Bates 22 on which document?

10 Q.   Whatever Bates 22 is.

11 A.   It's not on the transcript.  Bates 22?  I don't see a page

12 22 here, Counselor.

13 Q.   I'll get it for you.  That was my fault.  I thought I had

14 given it to you before.

15 A.   Okay.  No problem.

16 Q.   Tell us what this is and then we'll go from there.

17 A.   This is a 302, which is a report, FBI report, dated April

18 20, 2013.  And it was an interview of Mr. Matanov.

19 Q.   The first interview?

20 A.   Again, I didn't participate in the interviews of him at

21 all, so I'll take your word for it, that this was the first

22 one.  But I don't know that for sure.  I've not been involved

23 in this.

24 Q.   Okay.  Look at Bates 22.

25 A.   Okay.

1   Q.   Matanov did tell the FBI that time that he saw Tamerlan

2   often?

3   A.   Yes.

4   Q.   And on Bates 24, he called Tamerlan often?

5   A.   Yes.

6   Q.   And Tamerlan at one time drove him to get his driver's

7   license?

8   A.   I'm not seeing that part.  I'm sure it's here.  Could you

9   point me to it?

10  Q.   24.

11  A.   Page 24.  About the license?

12  Q.   Right.

13  A.   Yes, I see that.  Yes.

14  Q.   Okay.  And that he also told the FBI that he -- Matanov

15  would often invite Tamerlan to go to the Man-O-Salwa

16  restaurant?

17  A.   Yes.

18  Q.   He admits to going to Tamerlan's house?

19  A.   Yes.

20  Q.   He admits that he met Tamerlan's parents?

21  A.   Yes.

22  Q.   And that he Skyped with Tamerlan when Tamerlan was in

23  Russia?

24  A.   Is that on 24 as well, the Skyping?

25  Q.   26.  I'm sorry.

1    A.    26?  Yes, the top of the page.

2    Q.    Do you have Bates 36 there?  I should just --

3    A.    No, I do not.

4    Q.    I should just give you everything.

5          THE COURT:  And the government has a copy, I take it,

6    in front of them?

7          MR. GARLAND:  Yes, your Honor.

8          THE COURT:  It might help me to have a copy.

9          THE WITNESS:  Yes.  This is another 302.

10   BY MR. HAYDEN:

11   Q.    And that's from the next interview on April 24th?

12   A.    Okay.  It's dated April 24th, 2013.

13   Q.    And that's the first time that Matanov finally uses the

14   word "friendship," on Bates 36?

15   A.    Okay.  I don't know that for sure.  I have not read --

16   Q.    That's okay.  Just look at Bates 36.

17   A.    But you're making the claim that it's the very first time.

18   I haven't read all of these 302s.

19   Q.    Oh, I see what you're saying.  All right.  So he may have

20   said "friend" even earlier than that?

21   A.    I'm not sure.

22   Q.    All right.

23   A.    So on Bates 36?

24   Q.    Right.

25   A.    Yes.

1    Q.    Okay.

2    A.    He qualifies his relationship as a friendship --

3    Q.    Okay.

4    A.    -- with Tamerlan.

5    Q.    Right.  Now, go back to the indictment, Paragraph 32.

6    A.    Okay.

7    Q.    And he -- Matanov told Detective Heslam that he didn't

8    know whether Tamerlan lived with his wife and daughter?

9    A.    Okay.  It says here that he told a detective -- or the

10   detective.  I don't know if that's the same detective he's

11   referring -- if it's Heslam, the same one you're referring to.

12   Q.    Okay.

13   A.    He said that he knew Tamerlan Tsarnaev had a wife and

14   daughter but claimed he did not know whether they lived with

15   Tamerlan.

16   Q.    All right.  Now, going back to the transcript, Bates No.

17   12.

18   A.    Bates No. 12?  Okay.

19   Q.    But he does tell the detective that he's not sure where

20   the daughter and wife lived right now.

21   A.    That's correct.  That's what he said.

22   Q.    And this is after Tamerlan had already been killed?

23   A.    That's correct.

24   Q.    And on April 24th -- going back to that April 24th

25   interview -- it's Number 34 again.

1   A.   April 24th.  Bates-stamped 34?

2   Q.   Right.

3   A.   Okay.

4   Q.   He does tell the FBI that he saw the wife and daughter in

5   Tamerlan's residence.

6   A.   It says, "Matanov never saw anyone in Tamerlan's home

7   other than Tamerlan, his wife and their daughter."

8   Q.   Okay.  All right.  Fair enough.

9   A.   And Dzhokhar.

10  Q.   Okay.  Now, on April 24th, that was the day that Matanov

11  consented to a search of his car.

12  A.   Again, I don't have documentation --

13  Q.   33.  Page 33.

14  A.   33 of?

15  Q.   Bates.  Bates.

16  A.   Bates stamp 33?

17  Q.   Yeah.

18  A.   I've got 29 -- I don't think I have 33.

19  Q.   I thought I gave you everything.

20  A.   I have one that begins at 34 and one that begins -- 22

21  through 29, and then I have one that begins at 34 and concludes

22  at 45.

23  Q.   I thought I gave you 33.

24  A.   This is another FD-302 dated 4/24 -- it's dated 4/27, but

25  on the 24th -- it's a consent search of Mr. Matanov's vehicle.

```
 1   Q.   And he also consented to a search of his residence?

 2   A.   Yes, he did.

 3   Q.   And his cell phones?

 4   A.   Yes.

 5   Q.   And his electronic equipment?

 6   A.   Yes.

 7   Q.   And as far as you know, that's the first time the FBI

 8   asked him to consent to any searches.

 9   A.   As far as I know, yes.

10   Q.   All right.  And, I mean, that must have saved the FBI some

11   time in not having to get a search warrant.

12   A.   Sure.  Yes.

13   Q.   Now, on Friday of that week it's alleged that Mr. Matanov

14   deleted information from his computer.

15             THE COURT:  The date, for the record?

16             MR. HAYDEN:  On Friday, the 19th.

17             THE WITNESS:  Okay.  Are you referring to a particular

18   document?

19   BY MR. HAYDEN:

20   Q.   Well, do you agree with me or do you need to check it out?

21   A.   Well, I just would like to see the date.

22   Q.   Paragraph No. 40 of the indictment.

23   A.   Okay.

24   Q.   And that computer was seized on Saturday.

25   A.   Again, I don't -- here it said on the 24th.  The document
```

1   you're showing me, Exhibit 33 --

2   Q.   Oh, I'm sorry.  I made a mistake.  It was the 24th, which

3   was a Wednesday, I believe?

4   A.   I'll take your word for it.

5   Q.   Okay.  But in any event, the FBI was able to recover the

6   deleted files from that computer.

7   A.   Again, I'm not an expert in the computer -- downloading of

8   information or anything like that.  I'm not trained in that.  I

9   don't know what they were able to recover and what they

10  weren't.

11  Q.   Well, look at page 9 of that indictment, Paragraph 40.

12  A.   Okay.

13  Q.   And it indicates that he deleted videos posted by the FBI.

14  A.   Okay.

15  Q.   Agreed?

16  A.   Yes.

17  Q.   All right.  And he deleted photos of the Tsarnaev brothers

18  that had been posted by the FBI.

19  A.   Yes.

20  Q.   And he deleted a photograph of Officer Sean Collier that

21  had been posted by the FBI.

22  A.   That's what the indictment states, yes.

23  Q.   Okay.  And it also says on Paragraph 42 that he deleted

24  violent videos.

25  A.   Yes, that's what it says.

1   Q.   And you don't know what those videos depicted?

2   A.   I do not.  I've never viewed any of those.

3   Q.   And you have no idea whether or not those videos may have

4   shown the Tsarnaev brothers.

5   A.   I don't know what was on those videos.

6   Q.   Or Matanov.

7   A.   Correct.

8   Q.   Now, on the -- he admitted going to Tamerlan's house on

9   Wednesday.

10  A.   Where are you referring to, Counselor?

11  Q.   It was the April 20th interview.  I don't even have a

12  Bates number for it, so...

13  A.   Okay.  The April 20th interview.  Okay.

14  Q.   He admitted going to Tamerlan's house.

15  A.   Where -- where in -- you don't have a Bates stamp for it?

16  Q.   No, I don't.

17       Well, let me put it this way:  I mean, you'd agree -- you

18  know something about this case.

19  A.   Sure.

20  Q.   At some point he admitted going to Tamerlan's house.

21  A.   Yes, that's what I heard.

22  Q.   Okay.  I mean, he didn't withhold that information.

23  A.   No.

24  Q.   And during that week after the bombing, subsequent to

25  Monday --

1    A.    Okay.

2    Q.    -- Matanov made some comments to his roommate concerning

3    the bombings.

4    A.    That's my understanding, yes.

5    Q.    But he made those to the roommate, not to the FBI.

6    Agreed?

7    A.    Agreed.

8    Q.    Okay.  Not to any law enforcement.

9    A.    Not that I'm aware of.

10   Q.    Do you know, when did the FBI speak to the roommate?

11   A.    I don't know.

12   Q.    And on April 19th, the Friday, in Paragraph 23 of the

13   indictment --

14   A.    Okay.

15   Q.    -- it's alleged that Matanov told the roommate that he did

16   not know whether Tamerlan had any extremist views.

17             MR. GARLAND:  Objection, your Honor.  Just for

18   clarification, it states, I believe, that he told Witness 1

19   that he did not know whether he had any extremist views.

20             THE COURT:  All right.

21   BY MR. HAYDEN:

22   Q.    All right.  We'll say -- instead of "roommate," "Witness

23   1" --

24   A.    Okay.

25   Q.    -- all right?

```
 1    A.    That's what it states, yes.

 2    Q.    Again, he was talking to Witness 1.

 3    A.    Correct.

 4    Q.    He wasn't talking to the FBI.

 5    A.    No.

 6    Q.    On the 19th he was in his cab with someone identified as

 7    Witness 2.

 8    A.    Yes.

 9    Q.    All right.  And this is Paragraph 24.

10    A.    Okay.

11    Q.    And he told Witness 2 that it had been a while since he

12    was at Tamerlan's apartment.

13    A.    Right.  Well, it says "at that address," whatever that

14    address was.

15    Q.    Okay.

16    A.    Right.

17    Q.    Okay.  But the whole thing's referring to Tamerlan's

18    apartment, so...

19          But again, he was talking to Witness 2.

20    A.    Correct.

21    Q.    He wasn't talking to the FBI.

22    A.    That's correct.

23    Q.    And it was during that cab ride when they heard something

24    on the radio that he told Witness 2 that he recognized the

25    apartment as belonging to a friend.
```

1   A.   Correct.

2   Q.   I want to talk about the cell phones.  I mean, are you

3   aware of there's sort of a scam where cell phones are shipped

4   to other countries?

5   A.   Not personally, no.

6   Q.   Okay.  But you'd agree with me that it would be a

7   lucrative business to send cell phones from this country to

8   other countries?

9   A.   Potentially, yes.

10  Q.   All right.  I mean, if cell phones are stolen here, that's

11  illegal.

12  A.   Sure.

13  Q.   And it's a crime.

14  A.   I would imagine so, yes.

15  Q.   Even if it has nothing to do with terrorism.

16  A.   Correct.

17  Q.   On April 19th Matanov asked Witness 3 to take some cell

18  phones from him.  That's Paragraph 25.

19  A.   Yes.

20  Q.   Matanov never said that the phones had anything to do with

21  the Tsarnaevs.

22  A.   No.

23  Q.   Or with terrorism.

24  A.   No.

25  Q.   Or with the marathon bombings.

```
 1    A.    No.  What he said is that -- "Matanov said they were
 2    illegal and they might be found if the FBI searched his
 3    apartment."
 4    Q.    And -- because he knew the FBI was coming by Friday.
 5    A.    Sure.
 6    Q.    Because Heslam had told him that.
 7    A.    Right.  But it said, "The witness refused to take
 8    Matanov's cell phones."
 9    Q.    Okay.  But what I'm saying is what Matanov did, he tried
10    to get the witness to take it.
11    A.    Right.
12    Q.    Because he knew the FBI was coming.
13    A.    Correct.
14    Q.    And on April 24th he told the FBI that he ships the phones
15    to his family overseas.
16    A.    Where --
17    Q.    And that is on Bates 42.
18    A.    Bates 42?  Yes, that's what it said.  That's what that
19    document said.
20    Q.    Okay.  On April 19th, around noon, he asked Witness 1 to
21    keep one or two of his cell phones.
22    A.    What paragraph are you referring to?
23    Q.    37.
24    A.    37?  Yes, that's what it...
25    Q.    And again, you don't know if there's anything on those
```

1    cell phones related to the bombings.

2    A.    I do not.

3    Q.    When he met with the FBI on April 20th, that Saturday, he

4    didn't have a lawyer with him.

5    A.    Is there a 302 on that that you're referring to?

6    Q.    Well, I have Paragraph 24.  I don't have the 302.  I don't

7    know, but...

8    A.    Paragraph 24?  Do you have a Bates -- a Bates for me?

9    Q.    No, I don't.  I'm sorry.  It's the Saturday interview.

10            THE COURT:  All right.  Give the witness a moment to

11   look through the documents.

12            (Pause.)

13            THE WITNESS:  Do you have one in your hands that maybe

14   we could take a look at to --

15   BY MR. HAYDEN:

16   Q.    No, it's not that important.  I'll withdraw the question.

17   It's not that important whether or not he had a lawyer.

18            He -- on that day, that April 20th interview, he admitted

19   that he called Tamerlan shortly after the bombings.

20   A.    Yes.

21   Q.    Okay.  And this was before his phone was ever seized.

22   A.    Correct.

23   Q.    Before it was analyzed.

24   A.    Correct.

25   Q.    And you'd agree with me this is information that the FBI

1   would have had sooner if they interviewed him on Friday.

2   A.   Potentially.

3   Q.   On that April 20th interview he told you that he was at a

4   restaurant with the Tsarnaevs on Monday night.

5   A.   Do you have a reference to that particular statement?

6   Q.   Oh, Paragraph -- page 11, Paragraph B.

7   A.   Page 11.  This is from the 20th?

8   Q.   That is from the --

9   A.   There's only six pages.

10   Q.   No, the indictment.

11   A.   Oh, the indictment?

12   Q.   Yeah.

13   A.   Okay.  What paragraph?

14   Q.   Page 11, Paragraph B.

15   A.   Okay.

16   Q.   And he told the FBI that he had -- he was at the

17   restaurant with the Tsarnaev brothers Monday night.

18   A.   Yes.

19   Q.   And --

20   A.   He said that the brothers had walked in.

21   Q.   I'm sorry?

22   A.   He said that the brothers had walked in to the restaurant.

23   Q.   All right.  I'll get to that in a second.

24        But you'd agree with me that if you had interviewed him on

25   Friday, you would have had that information 24 hours earlier?

1    A.   Potentially, if he said those things when he was

2    interviewed initially, yes.

3    Q.   And that's the interview that he didn't say that he drove

4    the Tsarnaevs there.

5    A.   No, he said that they walked in to the restaurant.

6    Q.   Now, the affidavit said -- I'm sorry, not the

7    affidavit -- the indictment said that they discussed the

8    bombings at the restaurant.

9    A.   What paragraph is this, Counselor?

10   Q.   I think this is the last time I'm going to have to give

11   you something.

12            (Pause.)

13   BY MR. HAYDEN:

14   Q.   Count 2.

15   A.   Okay.  Count 2.

16        Okay.  This is the counts listed in the indictment, Count

17   1 and Count 2.

18   Q.   And it says that they discussed the bombings at the

19   restaurant.

20   A.   At the bottom of that page, which is page 16, it says,

21   "Drove the Tsarnaevs on the way to and from the restaurant and

22   discussed the bombings with the Tsarnaevs while at the

23   restaurant."

24   Q.   You'd agree with me that everyone in Massachusetts was

25   discussing the bombings that night.

1    A.    Yes.

2    Q.    All right.  And there's nothing that would indicate that

3    Matanov knew that those two were the bombers on Monday night?

4    A.    There's nothing that says that, no.

5    Q.    On May 3rd -- he was interviewed May 3rd.

6    Page -- Paragraph 46B.

7    A.    May 3rd?  Okay.  What's the Bates stamp?

8    Q.    No, this is the indictment.

9    A.    Oh.

10   Q.    Page 12, Paragraph 46B.

11   A.    46B?  Okay.

12   Q.    In that May 3rd interview he said that he thought that the

13   Tsarnaevs were involved after hearing a police officer at the

14   Quincy Adams T stop say that it was Chechnyan brothers who did

15   it.

16   A.    That's what it says here in the indictment, yes.

17   Q.    And that he overheard this -- supposedly overheard this at

18   the T stop on Friday morning, the 19th.

19   A.    That's what it says, yes.

20   Q.    But you think he saw the Tsarnaev photographs on the

21   website.

22   A.    Yes.

23   Q.    But in any event, he goes to the Braintree Police Station

24   within hours.

25   A.    Correct.

1    Q.    During the interview on July 8th he said that he had not

2    watched videos on the computer.  Page 14, Paragraph 47B.

3    A.    Okay.

4    Q.    He said that he had not watched videos on the computer,

5    correct?

6    A.    That's what it says here, yes.

7    Q.    And a forensic analysis showed that he had, in fact,

8    watched videos in January of 2013.

9    A.    Correct.

10   Q.    Three or four months before the bombings.

11   A.    Correct.  That's what it says, yes.

12   Q.    And you don't know -- you don't have any idea what those

13   videos were?

14   A.    No, I do not.

15   Q.    Now, he was interviewed April 19th by the Braintree

16   police, right?

17   A.    Yes.

18   Q.    April 20th by the FBI?

19   A.    Yes.

20   Q.    April 24th by the FBI?

21   A.    Yes.

22   Q.    May 3rd by the FBI?

23   A.    Yes.

24   Q.    May 31st?

25   A.    I don't see -- do you have a 302 on that, on the 31st?

1   Q.   I believe that's at the -- well, the 31st is July

2   8th *[sic]* -- would that be the indictment?

3   A.   I'm sorry.  What part?

4   Q.   His last interview was July 8th.

5   A.   July 8th of 2000 --

6   Q.   '13?

7   A.   -- '13?

8        Okay.  It lists that date on page 13 of the indictment

9   that there was an interview July 8th with Matanov.

10  Q.   And you don't know if he had any other interviews

11  subsequent to that?

12  A.   I do not know that.

13  Q.   But in any event, we do know that he was interviewed like

14  six times?

15  A.   Multiple times, yes.

16  Q.   And he wasn't in custody.

17  A.   No, he was not.

18  Q.   He was living in the apartment in Quincy.

19  A.   Correct.

20  Q.   When you wanted him to come in for an interview, you'd

21  either call him or call his lawyer.

22  A.   Again, I was not party to any of the interviews or any of

23  that process, but it did not appear that he gave any sort of

24  problem with coming in.

25  Q.   And he was under surveillance at least part of the summer.

```
 1   A.   Certainly.
 2   Q.   And do you know -- I mean, can you say when that
 3   surveillance ended?
 4   A.   I can't say.  I don't know.
 5   Q.   But the only thing he did wrong was sort of drive
 6   recklessly.
 7   A.   Again, during the surveillance operations, those were the
 8   things that were piquing the interest of the people that were
 9   involved in the surveillance.  They were concerned about that,
10   yes.
11   Q.   And once he was told to knock it off, he did?
12   A.   That's what it appears to be, yes.
13   Q.   Let me just briefly talk about the money and then I'm
14   done.
15        Those records the prosecutor introduced, $71,385 that he
16   transferred overseas other than the one in the United States.
17   A.   Correct.
18   Q.   All right.  Would you agree that's over a four-year
19   period?
20   A.   It says here between 2010 and 2013.  So close to it, yes.
21   Q.   I mean, without doing the math, it's about $17,000 a year?
22   A.   Okay.
23   Q.   And some of those records indicate he was using an alias
24   to send that money?
25   A.   That's what it says, yes.
```

1   Q.   And you'd agree with me that there are reasons for using

2   an alias sending money that have nothing to do with terrorism.

3   A.   Sure.   That's a possibility, yes.

4   Q.   And the family members -- his family members received

5   $56,590 over that four-year period.

6   A.   Yes.

7   Q.   And the FBI figured out his family members -- anyone with

8   the name "Matanov" that received money, correct?

9   A.   Yes.

10  Q.   Or "Mataeva."

11  A.   Correct.

12  Q.   But if he has a relative that just happens to have a

13  different last name, you wouldn't have picked it up?

14  A.   Again, that's logical.   But, again, I didn't participate

15  in that personally.   But, yes, that's a possibility.

16          MR. HAYDEN:   I have no other questions.

17          THE COURT:   Redirect?

18          MR. GARLAND:   Yes, please, your Honor.

19                      REDIRECT EXAMINATION

20  BY MR. GARLAND:

21  Q.   Special Agent McElroy, Mr. Hayden asked you a lot of

22  questions about what the FBI would have learned if it had

23  interviewed Mr. Matanov on April 19th after talking to

24  Detective Heslam.   If you could turn to Paragraph 34 of the

25  indictment.   Do you have that still in front of you?

1   A.   Yes.

2   Q.   Does it say in that paragraph that Mr. -- that any

3   discussion whether Matanov should contact the FBI himself,

4   Matanov said that his information would not assist the FBI in

5   conducting their investigation which he knew, he said, because

6   he had studied law?

7   A.   Yes, that's what it says.

8   Q.   Having reviewed the indictment before this and throughout

9   this hearing, is Mr. Matanov charged with lying every single

10  time in every single sentence to the FBI and to other

11  investigators?

12  A.   No, he is not.

13  Q.   Did the grand jury find probable cause to believe that

14  beginning on the morning of April 19th, before he had gone in

15  to the Braintree police, that Mr. Matanov knew or expected that

16  the FBI would come talk to him and want to search through his

17  things?

18          MR. HAYDEN:  Objection.

19          THE COURT:  Overruled.

20          If you can answer.

21          THE WITNESS:  Yes.

22  BY MR. GARLAND:

23  Q.   Does the indictment also charge that Mr. Matanov did make

24  various false statements -- that are not necessarily charged

25  but that were alleged -- to Witness 1 and to others, as well as

1  civilians, and to Detective Heslam?

2  A.   Yes.

3  Q.   And does it allege -- as well did the grand jury find

4  probable cause to believe that during the various times that he

5  was interviewed by the FBI, he told changing stories and

6  various lies to the FBI during those interviews?

7            MR. HAYDEN:  Objection, Judge.

8            THE COURT:  Overruled.

9            THE WITNESS:  Yes.

10 BY MR. GARLAND:

11 Q.   And are those set out in the indictment, and more

12 specifically, in Counts 2 through 4?

13 A.   Yes, they are.

14           MR. GARLAND:  Your Honor, may I take a moment to

15 confer with co-counsel?

16           THE COURT:  You may.

17           (Counsel confer.

18           MR. GARLAND:  No further questions.

19           THE COURT:  Any recross on that limited area?

20           MR. HAYDEN:  No recross, your Honor.

21           THE COURT:  You may step down.

22           (The witness is excused.)

23           THE COURT:  Further witnesses for the government?

24           MR. GARLAND:  No further witnesses.

25           THE COURT:  Witnesses for the defendant?

1           MR. HAYDEN:  No witnesses.

2           THE COURT:  All right.  I'll hear argument.

3           MR. GARLAND:  Thank you, your Honor.

4           Your Honor, Mr. Matanov poses a serious risk of

5     flight, and no set of conditions will reasonably assure his

6     appearance in court on these charges.  He has serious

7     incentives to flee the community:  He faces eight years on each

8     of the three false statement charges; he faces 20 years of

9     imprisonment on the obstruction charge; and because of his

10    status, he is likely to be deported after conviction.

11          Nothing significant will tie Mr. Matanov to this

12    community.  He's young --

13          THE COURT:  He cannot be deported to his home country,

14    is that correct, because of his asylum status?

15          MR. GARLAND:  Yes, that is -- yes.

16          He's young.  He hasn't been in this country long.

17    He's not a U.S. citizen.  He has no family in this country, no

18    evidence of other people who would support him.  He has no real

19    property in this district or -- he has no significant personal

20    property.  You've heard there's very little money.  Even his

21    taxicab is leased.  He doesn't have a job at this point.  It's

22    unclear whether he can even support himself or afford a place

23    to live.

24          So the only thing that's going to tie him to this

25    community, if he were let out on conditions, would be his

1    promise to appear in court.  But that promise would have to be

2    enforced by federal authorities, by pretrial.  And the grand

3    jury found probable cause to believe that Mr. Matanov

4    repeatedly deceived federal authorities.  And here I refer to

5    the allegations in the indictment.  That he laid the groundwork

6    with telling various pieces of misinformation to civilians in

7    the Braintree P.D., and then he told federal authorities lies

8    and changing stories on multiple occasions and for a long

9    period, mid-April through July 8th, about two and a half

10   months, over a variety of topics.

11         The grand jury also found that he hid evidence, or

12   probable cause to believe that he hid evidence from federal

13   authorities, and elicited the help of other people to do so.

14         Now, this pattern of deceit was also buttressed, I'd

15   say, in Exhibits 3 through 5, the financial transactions, which

16   show that Mr. Matanov also conducted a variety of financial

17   transactions in aliases.

18         Now, all of this risk of flight that Mr. Matanov poses

19   might possibly be theoretical except for the fact that we're

20   arguing that it is actual because he has the ability to flee.

21   He has significant ties to outside the country.  He has many

22   family members outside the United States.  He has friends and

23   associates outside the United States.  He maintains those ties

24   by sending money -- significant sums of money over a long

25   period.  He sent money to 15 different people.  And it went to

1    people in six different countries, not just his home country of

2    Kyrgyzstan, but also Egypt, Uzbekistan, Jordan, Turkey and

3    Greece.

4           Now, having the ability to go to people in those

5    countries is also made easier by the fact that, as you heard

6    testimony about, Mr. Matanov has the ability to speak seven

7    different languages.  What this all means is that he has the

8    ability to either tap resources or tap other people in other

9    countries, and he has the ability to function over there

10   because of his wide range of language skills.

11          And if you're likely to be deported after a conviction

12   anyhow, and you have the ability to go overseas, why not do so

13   now and avoid imprisonment?

14          So what you have here is you have Mr. Matanov who

15   would have to promise to show up.  You have evidence that he's

16   likely to break that promise.  He's deceived federal

17   authorities in the past, who would need to enforce that

18   promise.  And he has the ability and gross incentive, serious

19   incentive, to go overseas to avoid trial and imprisonment on

20   these charges.

21          And for those reasons we argue no set of conditions

22   would assure his reasonable appearance before these charges

23   before this Court.  We ask you to detain him.

24          THE COURT:  Thank you, Mr. Garland.

25          Mr. Hayden?

1        MR. HAYDEN:  Judge, at this point I can't object to

2   him being detained.  I've tried, but I've not been able to find

3   anyplace for him to go.  I mean, if in the unlikely event your

4   Honor were to simply release him right now, there's no place

5   for him to go and, you know, to live around here.  And

6   he's not --

7        THE COURT:  So shall I enter an order of voluntary

8   detention without prejudice at this time?

9        MR. HAYDEN:  Okay.  That would be fine.  And with your

10  Honor's permission, I would like to argue the strength or

11  weakness of the government's case at that time.

12       THE COURT:  At that time should you wish to reopen it.

13  All right.  So that will enter.

14       Are you ready to proceed with arraignment?

15       MR. HAYDEN:  Yes, your Honor.

16       THE COURT:  Have you reviewed the indictment with your

17  client?

18       MR. HAYDEN:  Yes, your Honor.

19       THE COURT:  And have you explained the nature of it to

20  him?

21       MR. HAYDEN:  Yes.

22       THE COURT:  And does he understand it?

23       MR. HAYDEN:  Yes.

24       THE COURT:  And is he prepared to be arraigned here

25  today?

```
 1            MR. HAYDEN:  Yes.

 2            THE COURT:  And may I have the maximum penalties,

 3      please?

 4            MR. GARLAND:  Yes, your Honor.  Mr. Matanov faces

 5      eight years of imprisonment on each of the false statement

 6      charges, a fine of $250,000, three years of supervised release,

 7      and a fine of $250,000, but also a special assessment of $100

 8      per count.  On Count 1, which is 18 U.S.C. 1519, obstruction,

 9      he faces 20 years of imprisonment, three years of supervised

10      release, a $250,000 fine and a $100 mandatory special

11      assessment.

12            THE COURT:  Thank you.

13            Will the defendant please stand.

14            (The defendant stands.)

15            THE CLERK:  Mr. Matanov, as to Count 1 of the

16      indictment charged in violation of Title 18, United States

17      Code, Section 1519, charging you with destruction, alteration

18      and falsification of records, documents and tangible objects in

19      a federal investigation, how do you plead, guilty or not

20      guilty?

21            THE DEFENDANT:  Not guilty.

22            THE COURT:  Please speak up for the record.

23            THE DEFENDANT:  Not guilty.

24            THE CLERK:  As to Counts 2 through 4 of the indictment

25      charging you with making a materially false, fictitious and
```

1    fraudulent statement in a federal investigation involving

2    international and domestic terrorism in violation of Title 18,

3    United States Code, Section 1001(a)(2), how do you plead,

4    guilty or not guilty?

5              THE DEFENDANT:  Not guilty.

6              THE COURT:  All right.  You may be seated.

7              How many witnesses does the government intend to call

8    and what's the probable length of trial?

9              MR. GARLAND:  Twenty to 30, your Honor.  And trial is

10   expected to take two to three weeks.

11             THE COURT:  All right.  I note that this case is

12   assigned to Judge Young.  And he will conduct the initial

13   status conference on July 15th at 2 p.m.

14             Now, Mr. Hayden, for the record, I don't believe you

15   delivered Defendant's Exhibit 1 to the clerk.

16             MR. HAYDEN:  Oh, I will do that.

17             THE COURT:  And are there any other documents that you

18   referred to that you wish to make part of the record?

19             MR. HAYDEN:  No, I don't think that's necessary,

20   Judge.

21             THE COURT:  All right.

22             Mr. Hayden, I would like to remind you pursuant to

23   Local Rule 83.2 about the release of information by attorneys.

24   I know that you did have a press conference after the initial

25   appearance and there were several statements made regarding

1    material that was in the pretrial services report.  That is not

2    a public document and I remind you of that.  And the nature of

3    this type of case, I just remind you to be cognizant of the

4    local rule and cautious about your statements to the press.

5            Any other matters counsel wish to bring to my

6    attention at this time?

7            MR. GARLAND:  Nothing for the government, your Honor.

8            MR. HAYDEN:  Nothing, your Honor.

9            THE COURT:  All right.  The defendant is remanded to

10   the custody of the United States Marshals.

11           THE CLERK:  All rise.

12           THE COURT:  We stand in recess.

13           (The Court exits the courtroom at 12:27 p.m.)

14           THE CLERK:  Court's in recess.

15           (The proceedings adjourned at 12:27 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

4     the United States District Court, do hereby certify that the

5     foregoing transcript constitutes, to the best of my skill and

6     ability, a true and accurate transcription of my stenotype

7     notes taken in the matter of Criminal Action No. 14-10159,

8     United States of America v. Khairullozhon Matanov.

9

10    /s/ Marcia G. Patrisso
      MARCIA G. PATRISSO, RMR, CRR
11    Official Court Reporter

12
      Date:  6/20/14
13

14

15

16

17

18

19

20

21

22

23

24

25