```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2
     * * * * * * * * * * * * * *
 3   UNITED STATES OF AMERICA    *
                                 *
 4              vs.              *     CRIMINAL ACTION
                                 *     No. 14-10159-WGY
 5   KHAIRULLOZHON MATANOV       *
                                 *
 6   * * * * * * * * * * * * * *

 7           BEFORE THE HONORABLE MARIANNE B. BOWLER
              UNITED STATES DISTRICT MAGISTRATE JUDGE
 8                      DETENTION HEARING

 9   A P P E A R A N C E S

10           UNITED STATES ATTORNEY'S OFFICE
             1 Courthouse Way, Suite 9200
11           Boston, Massachusetts 02210
             for the United States
12           By:  Scott Garland, AUSA

13
             LAW OFFICE OF EDWARD L. HAYDEN
14           7 Franklin Street
             Lynn, Massachusetts 01902
15           for the defendant
             By:  Edward L. Hayden, Esq.
16

17

18
                                    Courtroom No. 17
19                                  John J. Moakley Courthouse
                                    1 Courthouse Way
20                                  Boston, Massachusetts 02210
                                    June 23, 2014
21                                  2:40 p.m.

22

23            CAROL LYNN SCOTT, CSR, RMR
                Official Court Reporter
24            One Courthouse Way, Suite 7204
                Boston, Massachusetts 02210
25                   (617) 330-1377
```

```
 1                        P R O C E E D I N G S
 2              THE CLERK:  All rise.
 3              THE COURT:  Please be seated.
 4              THE CLERK:  United States District Court for
 5     the District of Massachusetts is now in session, the
 6     Honorable Marianne B. Bowler presiding.
 7          Today is Monday, June 23, 2014, the case of United
 8     States v. Matanov, criminal action No. 14-10159, will now be
 9     heard.
10          Would counsel please identify themselves for the
11     record.
12              MR. GARLAND:  Good afternoon, Your Honor.
13     Assistant U.S. Attorney Scott Garland on behalf of the
14     United States.
15              THE COURT:  Thank you very much.
16              MR. HAYDEN:  Good afternoon, Your Honor.
17     Edward Hayden for Mr. Matanov.
18              THE COURT:  Thank you very much.
19          Well, Mr. Hayden, we are here at your request.
20              MR. HAYDEN:  If I may be heard on the issue of
21     detention, Your Honor?
22              THE COURT:  You may.
23              MR. HAYDEN:  This is what we know from the
24     hearing we had a couple of weeks ago.  He went to the
25     Braintree Police.  He disclosed the name Tsarnaev and as far
```

1   as I know it was the first time that the FBI was informed or
2   any law enforcement that that was the name of the people
3   involved in the bombing.  He gave them their cell phone
4   number, the address, the type of --
5              **THE COURT:**  The date of this?
6              **MR. HAYDEN:**  That would have been Friday, the
7   19th.  Subsequent to that he met with the FBI five times.
8   He consented to a search of his apartment, his car, his cell
9   phone.  He cooperated with the FBI to, as I said, he met
10  with them five times.
11             And when that is balanced against what they say he
12  did, I have heard and this Court has heard no evidence of
13  how he obstructed this investigation or how he intended to
14  obstruct this investigation.  And Your Honor has heard no
15  evidence of how statements that he made materially impacted
16  the investigation.  But what you have heard is innuendo.
17             You heard about him trying to get rid of some cell
18  phones; but when you scratch a little deeper on that issue,
19  you realize that there is a totally different reason from
20  terrorism why he was trying to get rid of those cell phones.
21             And the most important issue is that the FBI has
22  had those phones.  They're not related to terrorism.  They
23  are related to his side business trying to make some extra
24  money by sending cell phones to Russia and having them sold
25  there.  It has nothing, they have nothing to do with

1    terrorism.  And Your Honor knows that if they had anything
2    to do with terrorism, you'd have heard about it by now.
3            And regardless of what you may think about his side
4    business of sending cell phones to Russia to make some extra
5    money, it certainly doesn't deserve being locked up in
6    solitary confinement at Plymouth.
7            The other innuendo that you heard is how he has
8    sent about $71,000 all over the world.  And the first issue
9    that is raised is where does he come up with all that money.
10   But, No. one, you have to remember that this was over a
11   three- to four-year period so, I mean, it is approximately
12   $20,000 per year.  He was working 15 to 18 hours a day seven
13   days a week.  After his expenses he was bringing home at
14   least $55,000.  He can afford the money that was going to
15   these various places.
16           **THE COURT:**  Is this before or after tax?
17           **MR. HAYDEN:**  Well, my count -- these are rough
18   calculations, Your Honor.  As far as I know, there was no
19   tax paid.
20           I am talking about what he was paying for his cab,
21   what he was paying for rent, what he was paying for his food
22   and utilities, et cetera.  He had available to him
23   approximately $55,000.
24           The next issue is -- once we resolve that he could
25   afford to send this money and it wasn't coming from any

1   nefarious activity here in this country, who was getting
2   this money.  And from what we heard last time, the bulk of
3   it, approximately $56,000, was going to his relatives in
4   various parts of the world, not only Kyrgyzstan but various
5   parts, where they were working in construction but they --
6   but they were relying, when I say the prosecution was
7   relying on the last names of the people that were receiving
8   the money to match them up as family, as his family members,
9   but they missed three of them.  And there is one person in
10  Kyrgyzstan whose name is Jorabek Alimbaev who is his
11  grandfather.  And they missed that because he had a
12  different last name but he had sent about $6500 to his
13  grandfather.  So this closes the gap even more.
14          And the two people that he sent money to in
15  Uzbekistan are both cousins.  And one he sent $890 because
16  Mr. Matanov's 15-year old brother needed heart surgery and
17  it couldn't be done in Kyrgyzstan so his mother took him to
18  Uzbekistan.  She was staying with cousins there.  So he sent
19  some money to help with the expense of the heart surgery.
20          And then there is another cousin in Uzbekistan who
21  he sent $1400 to him.
22          There are -- the person he sent money to -- the
23  reason I'm explaining this, because, I mean, the way it was
24  left the other day that he is sending this money all over
25  the world to finance terrorist activities.  But he sent

1    money to a guy in Greece because at the time Mr. Matanov was
2    working at a pizza shop in South Yarmouth.  And the people
3    who owned that pizza shop happened to be Greek.  He
4    mentioned that he was going to go to MoneyGram.  They told
5    him where it was and they said, oh, while you're there, can
6    you send some money to our relative in Greece and --
7              **THE COURT:**  Well, now, when did he work at a
8    pizza shop?  That is not in the pretrial.
9              **MR. HAYDEN:**  I think that was his job when he
10   first got here, Your Honor, when he first, like, four years
11   ago.
12             **THE COURT:**  Well, he didn't tell anyone about
13   it at the interview.
14             **MR. HAYDEN:**  He worked there.
15         So that's where that money went to in Greece.
16         And the other one that raised eyebrows is he was
17   sending money to someone in the United States and that
18   person was a friend of his who lived in Virginia and he had
19   lost his job and he was coming, he needed bus fare to get to
20   Massachusetts.  He was going to look for a job when he got
21   here.  And that's where that money went.  It had nothing to
22   do with terrorism.
23         And every other person on that list was a friend of
24   his who, one guy needed money to buy a car, one needed money
25   for college tuition and the other one was starting a

1    business in Turkey and he was importing clothes from Egypt
2    and that's why he sent him the money.  None of this had
3    anything to do with terrorism.
4             Now, somewhere along the lines someone told him
5    that he shouldn't use his real name because it could cause
6    tax problems for him so he came up with some fake names that
7    he used.  But I think it's important for Your Honor to know
8    that he is the one who told the FBI that he sent this money
9    using a fake name.
10            Now, as far as I know, they wouldn't have had that
11   information if he didn't volunteer it for him -- for them.
12            Now, as far as, I think the strongest argument that
13   I can make that Your Honor should release him on terms is
14   that for about a year the FBI was following him.  I mean,
15   they know what he was doing.  They know he's just a
16   hard-working guy driving that cab for about 15, 18 hours a
17   day.
18            During that period of time there is absolutely no
19   evidence that he had anything to do with terrorism, that he
20   had anything to do with the Marathon bombing.  He wasn't
21   trying to flee.  He wasn't a danger to anyone.  And they
22   know because they were following him.
23            And the show of force when he was arrested was just
24   unnecessary.  Every time they wanted to speak with him, and
25   we know it was at least five times, they would just either

1    call him or call his lawyer and make arrangements for him to
2    show up and he voluntarily did that.  There was no need for
3    the show of force when he was arrested but what that does do
4    is it prejudices Your Honor.  I mean, everyone thinks if
5    they've got to use all this show of force and surrounding
6    the apartment, he must be dangerous.  They wouldn't do it if
7    he wasn't dangerous and that is just not true.
8            Every other time that they wanted to meet with him,
9    he showed up voluntarily and that would have been the exact
10   same thing when he was arrested if they had just told him to
11   show up in the court and he wouldn't have had this show of
12   force that was completely unnecessary.
13           And since the last time we have been, we were in
14   here, I have found an apartment for him.  I'd rather not say
15   the address in open court but I'd certainly be happy to
16   provide that to Your Honor.  I have provided it with the
17   prosecutor, to the prosecutor about a week and a half ago.
18   He had the FBI go check out the apartment, check out the
19   landlord, and there is no problem with either of them.  That
20   apartment is available right now.
21           I have tried to --
22           **THE COURT:**  Would he be living with anyone?
23           **MR. HAYDEN:**  No.  I mean, there is no one in
24   there.  And, again, whatever conditions that Your Honor sees
25   fit to impose, whether it is the bracelet, et cetera, or

1  hours of curfew, obviously he would comply with that because
2  the conditions that he is held in now at Plymouth are really
3  Draconian and it's just not necessary for what he is alleged
4  to have done.
5       Now, I have tried to find him a job.  We contacted
6  the guy that owns the cab company where he used to work in
7  Braintree.  He says good things about him, that he is a good
8  worker, he'd love to take him back but he is concerned about
9  his safety if he does come back before this case is over
10 with.  And that's why he is somewhat reluctant to do that.
11      I do have a couple of other leads on jobs, that
12 they have not been nailed down but I think we will be able
13 to find some job fairly quickly.
14           **THE COURT:**  What is going to pay for this
15 apartment in the interim?
16           **MR. HAYDEN:**  His mother sent me money, and I
17 told the prosecutor this, and that money is now in my IOLTA
18 account and I will give it to Mr. Matanov if Your Honor
19 releases him.
20      So that's all I have.
21           **THE COURT:**  All right.  Mr. Garland.
22           **MR. GARLAND:**  Thank you, Your Honor.
23      I don't want to go through all of the argument that
24 I gave last time but there are a few points I think bear a
25 little bit of rebuttal.

1          I do not believe that there is any evidence that
2     Mr. Matanov was the one who broke the identity of the
3     Tsarnaevs at all.  There is evidence that he did come in the
4     morning of that Friday, April 19th, to the Braintree Police.
5     There is, the allegations in the indictment are that he did
6     so after realizing that that was inevitable, that law
7     enforcement was inevitably going to associate them with him
8     and that they would start talking to him.
9          And so there is discussion in the indictment, which
10    the grand jury found probable cause to believe the
11    allegations in there, that he then went to the Braintree
12    Police and he said a mixture of things.  Some of those
13    things were true.  Some of those things were misleading.
14         And at the end of it he said to the Braintree
15    Police, I've studied law.  I don't think there is very much
16    more for me to give you on this.  There is not a lot more
17    information about that.  There was testimony about that at
18    the last hearing.
19         And so some of what Mr. Hayden had questioned the
20    agent about last time was why did the FBI not come talk to
21    him until April 20th, the next day.  I would suggest that
22    there is ample evidence that that is the reason why.
23         There is also evidence as well that Mr. Matanov did
24    go throughout on a variety of days and talk to various
25    federal officials:  April 20, April 24, May 3rd, May 31 and

1    July 8.  But the allegations in this indictment are that on
2    the dates that I just mentioned Mr. Matanov told a variety
3    of things that were true and a variety of things that were
4    as alleged very specifically in the indictment false.  And
5    this is not as was argued last time a case in which we're
6    alleging that everything that he said was false.  In fact,
7    we are saying that some of the things he said were true but
8    in some things that were very material to the investigation
9    and the ongoing investigative, he said things that were
10   false.
11            And one of the best ways that you can hide a lie is
12   to wrap it up in the truth and in other truths as well.
13   Mr. Hayden has asked how could that be if he's given all
14   these things that are true that the lies were material to
15   the investigation?
16            Well, the materiality of the lies and the
17   investigation itself are spelled out in the indictment quite
18   clearly.  They had to do with the whereabouts of the
19   Tsarnaevs on the night of that, that first night and
20   different contacts that he had had with the Tsarnaevs as
21   well, when he learned about information and all of that is
22   spelled out in the indictment right there.
23            The other thing that is material about the lies, of
24   course, is that when you are talking to the suspect and you
25   believe that that person is giving you true information and

1  then they give you information that turns out not to be
2  true, that requires you to go back and look at everything
3  else that was looked at or said during those interchanges
4  and reevaluate everything that you've heard at that time.
5          Now, Mr. Hayden also talked about, a bit about the
6  funds and where the funds went, the use of aliases and all
7  of that.
8          You recall, Your Honor, that one of the things that
9  Mr. Hayden said was that it was Mr. Matanov who told the FBI
10 that he was sending money out in fake names.  Now, that may
11 be true but that wasn't the first time that they learned
12 that.
13         You recall that, I believe it was Exhibits No. one
14 and No. two which were those photos of MoneyGram remittance
15 forms, those were found in Mr. Matanov's apartment on
16 April 20th.  Those don't have his name on it.  They have
17 other names on it.  That I suggest was the first time that
18 the FBI and the Task Force learned that Mr. Matanov might be
19 sending money out under fake names.
20         Now, Mr. Hayden has talked about the sources of
21 those funds and the uses for which those funds were made.
22 The argument here has not been that Mr. Matanov is
23 dangerous.  We have not moved under dangerousness.  We have
24 moved under risk of flight.  We have not alleged that the
25 funds that went out to people across the world were used for

1    terrorism, were derived from terrorism either.

2            What we have alleged, however, is that by sending
3    money to a variety of different people around the world,
4    even if those funds were totally legal and completely
5    derived from lawful activities, which they may very well
6    have been, that what that does is give him the ability to go
7    to a variety of different countries.  It gives him a soft
8    place to land in a different country and that is the
9    concern.

10           And the argument was last time that it is not just
11   having people in those other countries but also the ability
12   to speak in a variety of different languages that would
13   allow him to make that soft landing.  He does then, of
14   course, have not only the incentive to flee but also the
15   ability to do so because he knows that whether they're
16   friends or families or business acquaintances in various
17   countries, these are people who might want to take him in
18   because they owe him some sort of a debt, even just a debtor
19   friendship.

20           One of the things that Mr. Hayden talked about was
21   the apartment.  And it's true that we had a discussion about
22   the apartment.  And the objection -- the government is not
23   objecting to that particular apartment itself.  As
24   Mr. Hayden said, and rightly so, we've looked into it a
25   little bit.  There is no objection to that particular

apartment, although my understanding from Mr. Hayden, and maybe things have changed since then, was that the apartment was going to be, I don't know that it's a month-to-month lease.  It might only be for three months.  If that's true, then we will have to figure out where to be, if you release him on conditions, in three months from now if that lease is up at that time.

But the government is not saying, despite the fact that it doesn't object to that apartment, that the Court should let him go to that apartment.  The government is continuing to renew and maintain its motion to detain him because of the risk of flight for all the factors that I argued at the last time.

If the Court is thinking about letting Mr. Matanov go out on conditions, I'd ask for an opportunity to address the Court about what those specific conditions might be, whether it is at this hearing or a future time, Your Honor.

**THE COURT:**  Thank you, Mr. Garland.

Any response?

**MR. HAYDEN:**  No, I don't have anything to add, Your Honor.

**THE COURT:**  All right.  Well, having heard the evidence at the detention hearing and having listened to the arguments today, I am satisfied that the government has met its burden under Section 3142, Section (f)(2)(a) of the Bail

1    Reform Act that the defendant constitutes a risk of flight
2    or failure to appear.  And in this court we are certainly
3    familiar with other defendants who have not fled the country
4    but who have gone under the radar, some for many years.
5        The defendant lacks any ties to the community.  He
6    has no family present in the United States.  He has no
7    assets, no property interest.  And of concern to the Court
8    is the use of aliases and, more importantly, the
9    transmission of money to Egypt, Jordan, Turkey, Greece,
10   among other places.
11       The government's argument that the defendant might
12   have a place in another part of the world to have a soft
13   landing does give this Court pause.
14       A written opinion will follow but at this time the
15   defendant is detained as constituting a risk of flight.
16       The defendant is remanded to the custody of the
17   United States Marshals.
18           **THE CLERK:**  All rise.
19
20       (WHEREUPON, the proceedings were recessed at 3:02
21       p.m.)

C E R T I F I C A T E

      I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/S/CAROL LYNN SCOTT

_____

CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377

**DATE: July 17, 2014**