UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )<br><br>UNITED STATES OF AMERICA )<br><br>v. )<br><br>KHAIRULLOZHON MATANOV, )<br>*Defendant* )<br>_____ ) | DOCKET NO.: 14 CR 10159 |

## **DEFENDANT'S MOTION TO REVOKE DETENTION ORDER**

Defendant Khairullozhon Matanov, pursuant to 18 U.S.C. § 3145(b), respectfully moves

this Court to revoke the order of detention issued by Magistrate Judge Bowler on June 23, 2014,

and to release him on such conditions as the Court deems appropriate. The Government has

acknowledged that Mr. Matanov presents no danger to the community, and the only basis for

pre-trial detention is risk of flight. Tr. of 6/23/14 Hearing, p. 12. As demonstrated below, the

Government cannot sustain its burden to show that Mr. Matanov is a flight risk. Mr. Matanov has

lived in the community for over one year without incident, knowing that he was under

investigation and at risk of indictment. He was subject to obvious surveillance of his daily

activities, and repeated contact with the FBI and the United States Attorney's Office. Faced with

this knowledge, he continued his life in the United States. Instead of fleeing, he continued

working as a cab driver and applied for college in the Boston area. He readily agreed to multiple

interviews with law enforcement and complied with the Government's requests. There is no

basis for Mr. Matanov's continued detention, and the conditions outlined in this motion will

ensure his appearance in court.

1

## EVIDENCE

Mr. Matanov is charged with one count of violating 18 U.S.C. § 1519, by deleting video and picture files from his computer. He is also charged with three separate counts of violation of 18 U.S.C. § 1001. Count 2 alleges that Mr. Matanov made a false statement about whether he arrived with or drove the Tsarnaev brothers to a restaurant on the night of April 15, 2014. Count 3 alleges that Mr. Matanov was unclear about the precise moment he realized the Tsarnaev brothers were the suspected bombers, and Count 4 concerns false statements regarding Mr. Matanov's video viewing. The prosecution has never explained how these actions could have affected the investigation or how the subjects are material.

## MAGISTRATE JUDGE'S DECISION

The Magistrate Judge found Mr. Matanov to pose a flight risk because he does not have family living in the United States and because he sent money to friends and family who live elsewhere. Judge Bowler stated that she would provide a written decision by July 25. She has not yet issued such a decision and has provided no further timeline for doing so, despite counsel's attempts to contact her clerk.

## DEFENDANT'S VOLUNTARY COOPERATION

In the year between the marathon bombings and his arrest, Mr. Matanov made no attempts to leave the greater Boston area, and cooperated with investigators' every request. Tr. of 6/4/14 Hearing, pp. 8- 9. Mr. Matanov voluntarily approached the police on April 19, 2013, the morning after he realized that the Tsarnaev brothers were suspected in the bombings. He met with law enforcement five times and made no attempts to escape, even though he "understood… that as a part of their investigation, federal investigators would likely want to discuss with [Mr. Matanov] his friendship, contact, and communication with Dzhokhar and Tamerlan Tsarnaev…"

Indictment, ¶ 22. On the contrary, he sought out police because he believed he had information that could facilitate the investigation. He consented to speaking with the FBI, and allowed them to search his cell phone, computer, apartment, and taxi cab. Mr. Matanov obtained legal representation to facilitate proffer sessions with the government. He complied with the government's requests to drive his taxi cab in a certain manner, to avoid the Boston area during the 2013 July 4th holiday period, and again to avoid the Boston area during the 2014 marathon weekend. Mr. Matanov was aware of law enforcement surveillance at the beginning of the investigation. When he believed the surveillance had been reduced or ended, he made no attempt to flee.

Mr. Matanov is an immigrant to the United States. He values the opportunity to live, work, and study here. Because of his fear of having to return to persecution in his home country, Mr. Matanov has been especially motivated to cooperate with the investigation and any requests from the government, and he is now motivated to cooperate with this court proceeding.

## DEFENDANT'S PERSONAL HISTORY

Mr. Matanov was born on October 4, 1990 in Suzak, Kyrgyzstan, the second of five children. His family is Uzbek, a minority ethnicity in Kyrgyzstan that faces systematic and sometimes violent persecution. After graduating high school in Jalalabad, Kyrgyzstan, Mr. Matanov went to Moscow, Russia, to find work as a construction worker and security guard to help pay family expenses. He returned to Kyrgyzstan to start college in 2008 at the A. Batyrov University of People's Friendship, an Uzbek-run university, where he majored in law.

In 2010, Mr. Matanov's university closed after it was sacked and destroyed in violent attacks by ethnic Kyrgyz. The same year, Mr. Matanov fled to the United States because of persecution on account of his ethnicity. He has worked as a taxi driver for Braintree Checker Cab

and as a cook at Man-o-Salwa Restaurant in Somerville. For the first time in his life, Mr.

Matanov was able to earn more money than he needed to survive, and he worked overtime to

send money to his family and friends when they were in need. In 2013, after Mr. Matanov had

finished paying his parents' debts, he applied to University of Massachusetts, Boston and Quincy

College to continue his studies. Mr. Matanov dreams of completing his college education and

becoming an IT professional.

Mr. Matanov is well connected to his community and has an extensive network of

friends. At Braintree Checker Cab, Mr. Matanov was well liked and respected among his

coworkers. He also regularly plays soccer with a close-knit group of friends.

Mr. Matanov's primary desire is to remain in the United States. He values the ability to

live in a safe society with egalitarian values, and strives to continue his studies and find a better

job. Even though he is facing a lengthy prison sentence, he would rather accept it and remain in

the United States rather than return to the oppression he endured in Kyrgyzstan or go anywhere

else.

## ARGUMENT

### 1. Standard for Detention

This Court reviews the Magistrate Judge's order of detention *de novo*. *U.S. v. Tortora*,

922 F.2d 880, 883 n. 4 (1st Cir. 1990). "In our society liberty is the norm, and detention prior to

trial or without trial is the carefully limited exception." *U.S. v. Salerno*, 481 U.S. 739, 747

(1987). Pretrial detention is permissible only where the Court finds that "no condition or

combination of conditions will reasonably assure the appearance of the person as required and

the safety of any other person and the community." 18 U.S.C. § 3142(e). The government bears

the burden of persuasion to prove by a preponderance of the evidence that no conditions will

assure the defendant's presence, or by clear and convincing evidence that no conditions will

reasonably assure the safety of the community. *U.S. v. Palmer-Contreras*, 835 F.2d 15, 1-18 (1st

Cir. 1987). Here, the Government has acknowledged that Mr. Matanov presents no danger to the

community. Tr. of 6/23/14 Hearing, p. 12.

On the issue of flight risk, the Court has ample evidence to rely upon: the one year that

Mr. Matanov was under investigation. Had Mr. Matanov wanted to flee, he had many

opportunities to do so, particularly after the cover surveillance ended. Instead, he came forward

with information he thought could be helpful to the Government, and made every effort to

comply with its requests.

Mr. Matanov values the ability to work in the United States and support his family. The

Government asserts that Mr. Matanov may leave the country to join people to whom he has sent

money. However, remitting money to loved ones outside the country and speaking languages

other than English is an ordinary aspect of immigrant life.[1] In fact, Mr. Matanov's priority is to

stay in the United States and work, so that he can continue to give financial assistance to his

family members. Mr. Matanov's responsibility and concern in caring for his family should not be

held against him.

During his time in the United States, Mr. Matanov sent money to his mother, father, and

brother to pay for their medical care and living expenses. His father, who had been the family's

primary breadwinner, suffered a stroke several years ago that left him partially paralyzed and

unable to work, care for himself, or support the family. See Exh. [A], Medical Records of

Abdullajan Matanov. Before his stroke, Mr. Matanov's father had taken out two business loans

---

[1] The Congressional Budget Office estimates that immigrants sent nearly $48.4 billion dollars to other countries in 2009. See CBO, "Migrants' Remittances and Related Economic Flows," February 2011, available at http://www.cbo.gov/publication/22012.

totaling $40,000.00 that were secured by the family home and an office building. Because Mr. Matanov's father could not repay the loans after he fell ill, Mr. Matanov worked overtime in the United States in order to help his parents repay the loans and keep their home. See Exh. [B], Affidavits Concerning Funds. Additionally, Mr. Matanov's youngest brother had heart surgery in September 2011. See Exh. [B], Medical Records of Oyatillo Matanov. Because the medical system in Kyrgyzstan is corrupt and requires bribes, Mr. Matanov's mother and brother traveled to Uzbekistan for the surgery and recuperation period. Mr. Matanov sent money to his cousin Alisher Khujamberdiev in Uzbekistan to pay for the surgery and related expenses.

Mr. Matanov also sent various smaller amounts of money to other relatives and friends. He supported his younger brother, who was studying in Egypt. He sent money to a cousin who had previously lent him money, and to a friend in Turkey for a business venture that never took off. See Exh. [C] for affidavits from money recipients. The Government has had one year to investigate the people who received money from Mr. Matanov. It has not alleged that anyone who received money from Mr. Matanov is connected in any way with terrorist activity.

It is true that Mr. Matanov speaks seven languages. Kyrgyzstan, a former Soviet republic, has two official languages: Kyrgyz and Russian. In addition to these, Mr. Matanov speaks Uzbek, Turkish, Turkmen, and Kazakh. These languages are not very useful outside of the immediate region and certainly would not ensure Mr. Matanov a "soft landing" in other parts of the world, as the government claims. The proposed conditions of electronic monitoring and passport surrender would make international travel exceedingly difficult for Mr. Matanov.

## 2. Defenses to Charges

After ample opportunity in two detention hearings and in the Indictment, the Government has failed to identify any way that Mr. Matanov's actions obstructed their investigation, or any

support for the contention that his statements were material. To qualify as "material" under 18

U.S.C. § 1001, a statement must have "had a natural tendency to influence, or was capable of

influencing, a governmental function." *U.S. v. Sebaggala*, 256 F.3d 59, 65 (1st Cir. 2001). The

government has provided no explanation as to how its investigation would have been influenced

by Mr. Matanov's statements concerning the precise moment he realized the Tsarnaevs were

suspects, the protected First Amendment activities he engaged in through his computer, or the

details surrounding their dinner together.

    a. *Count Two: The investigation would not change whether Mr. Matanov drove with, or arrived separately, to the dinner with the Tsarnaevs.*

Although the Government prepared the Indictment and argued twice at detention

hearings, it has yet to proffer any evidence on how Mr. Matanov obstructed the investigation or

how his statements were material. The Government does not allege that Mr. Matanov was

involved in the bombing in any way. The Government has not provided any information to

suggest that its investigators would have acted differently whether Mr. Matanov arrived

separately or together to dinner with the Tsarnaevs. Mr. Matanov told the investigators about the

dinner, and they were able to investigate the restaurant in question and others who may have

been present.

    b. *Count Three: The moment Mr. Matanov recognized his friends as the bombing suspects is irrelevant to the investigation.*

Mr. Matanov, like everyone else in the greater Boston area, followed news updates of the

marathon bombing investigation on his computer and phone during April 2013. The Supreme

Court has recognized that "[t]here is an undoubted right to gather news 'from any source by

means within the law.'" *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978), internal citations

omitted, *quoted in Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011). Mr. Matanov went to the

Braintree police of his own accord on Friday, April 19. The Government has alleged that Mr.

Matanov may have recognized the Tsarnaevs some hours earlier. However, the government's

investigation strategies were unaffected by Mr. Matanov's private thoughts; instead, they were

aided by the information Mr. Matanov voluntarily provided. It is difficult to understand how the

investigation could have been influenced by these statements.

  c.  *Counts One and Four: The investigation does not concern Mr. Matanov's protected*
      *First Amendment activity and personal beliefs.*

Viewing videos and photographs are protected First Amendment activities. *See Thomas*

*v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002), *and Kaplan v. California*, 413 U.S. 115, 119-

120 (1973) (films are protected by the First Amendment). The government has not yet disclosed

the content of these videos and has never alleged that deleting them obstructed the investigation.

Additionally, the government has not alleged that the substantive content of the videos is

relevant to the charges at hand. Because Mr. Matanov's video and photo viewing does not lend

intent to the charged crimes, his statements about viewing videos and photographs could not be

material to the government's investigation of the Tsarnaev brothers.

Additionally, because Mr. Matanov's personal beliefs are irrelevant, his computer history

does not change the investigation. In its Indictment, the government alleges that Mr. Matanov

violated §1519 by deleting computerized videos and photographs indicative of "the extent to

which he shared the suspected bombers' philosophical justification for violence." Without more,

the fact that the files and videos evince a "philosophical justification for violence" does not make

them material.

Mr. Matanov is not, as the Government has suggested, a flight risk. He is a hard-working

young man who intends to continue driving his cab, and who aspires to continue his college

education. He appreciates that the United States has granted him safe haven, and wishes to do

everything possible to retain his immigration status here. He has a deeply supportive circle of friends and acquaintances. Mr. Matanov was not involved in the bombing and is not now accused of any violent activity. He is currently in solitary confinement, 23-hour-per-day lockdown, and will remain there until trial if he is not released.

**PROPOSED CONDITIONS OF RELEASE**

Mr. Matanov proposes the following conditions, in addition to the standard conditions of release:

1. Mr. Matanov to reside at a residence disclosed to prosecution, probation, and the judge;

2. Mr. Matanov to be subject to electronic monitoring;

3. Mr. Matanov to be employed, or seek employment;

4. Mr. Matanov to surrender his passport to Probation;

5. Mr. Matanov to check in with Probation daily.

Mr. Matanov urges this Court that these proposed conditions will assure his appearance, as well as the safety of the community.

> Respectfully submitted,
> KHAIRULLOZHON MATANOV
> By his attorney,

Date:   7/28/14

> FOR THE DEFENDANT,
>
> /s/EDWARD L. HAYDEN
> 7 FRANKLIN STREET
> LYNN MA 01902
> (781) 599-1190
> BBO 226430

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.