UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CRIMINAL ACTION NO. 14-10159-WGY



**UNITED STATES OF AMERICA**

**v.**

**KHAIRULLOZHON MATANOV**


**MEMORANDUM AND ORDER ON GOVERNMENT'S**
**MOTION FOR DETENTION**


**July 31, 2014**


**BOWLER, U.S.M.J.**

On or about May 30, 2014 defendant Khairullozhon Matanov
(the "defendant"), was arrested pursuant to a four count
Indictment returned in this district on May 29, 2014.  Count One
of the Indictment charges the defendant with destruction,
alteration and falsification of records, documents and a tangible
object in a federal investigation in violation of Title 18,
United States Code, Section 1519.  Counts two through four charge

1

the defendant with making materially false, fictitious and fraudulent statements in a federal investigation involving international and domestic terrorism in violation of Title 18, United States Code, Section 1001(a)(2).

The defendant had his initial appearance before this court on May 30, 2014.  He was represented by court appointed counsel.[1] The government moved to detain the defendant on the grounds that there is no condition or combination of conditions that will reasonably assure the appearance of the defendant.  18 U.S.C. § 3142(f)(2)(A).  The government moved for a three day continuance and a detention hearing was scheduled before this court on June 4, 2014.

At the detention hearing on June 4, 2014, the defendant was represented by court appointed counsel.  The government called one witness speaking to the issue of detention.  The defendant did not call any witnesses.  At the conclusion of the evidence defense counsel indicated that his client would enter into a period of voluntary detention without prejudice to revisiting the issue of detention at a later date.

---

[1]  Attorney Paul Glickman ("Attorney Glickman") appeared before this court at the defendant's initial appearance on the above-captioned matter and stated that he represented the defendant in regard to the defendant's immigration issues.  Attorney Glickman requested to be appointed to represent the defendant in the pending matter.  Because Attorney Glickman is not on the list of CJA panel attorneys designated to accept appointments in criminal cases this court appointed Attorney Edward L. Hayden, who was the next available attorney on the CJA panel list and who was standing by in the courtroom, to represent the defendant.

On June 19, 2014 defense counsel contacted the deputy clerk and requested to reopen the issue of detention.  A hearing was scheduled for June 23, 2014.  On that date defense counsel proposed conditions of release and the government responded in opposition.  No testimony was presented.

At the conclusion of the hearing, this court found, by a preponderance of the evidence, that no condition or combination of conditions will reasonably assure the appearance of the defendant if he is released.  This court set forth a brief summary of its reasons on the record and stated that a written opinion, setting forth the reasons in detail, would follow.

DISCUSSION

I.   A.   Under the provisions of 18 U.S.C. § 3142©, "[t]he judicial officer may not impose a financial condition that results in the pretrial detention of the person."  Thus, a defendant must be released under the provisions of 18 U.S.C. § 3142(b) or ©, or be detained pending trial under the provisions of 18 U.S.C. § 3142(e) and after a hearing pursuant to 18 U.S.C. § 3142(f).  See 18 U.S.C. § 3142(a).

Under 18 U.S.C. § 3142(e), a defendant may be ordered detained pending trial if the judicial officer finds one of the following three conditions to be true that: (1) by clear and convincing evidence, after a detention hearing under the provisions of § 3142(f), ". . . no condition or combination of

conditions (set forth under 18 U.S.C. § 3142(b) or ©) will reasonably assure the safety of any other person or the community . . .;" (2) by <u>a preponderance of</u> the evidence, after a detention hearing under the provisions of 18 U.S.C. § 3142(f), ". . . no condition or combination of conditions (set forth under 18 U.S.C. § 3142(b) or ©) will reasonably assure the appearance of the person as required . . .;" or (3) there is a serious risk the defendant will flee.[2]  This determination is made by the court at the conclusion of a detention hearing.

B.   The government is entitled to move for detention in a case that:

(1)  involves a crime of violence within the meaning of 18 U.S.C. § 3156(a)(4);[3]

---

[2]  The distinction between the former and the latter are made clear by the very language of 18 U.S.C. § 3142(f).  In the last paragraph of that section, Congress has stated there must be <u>clear and convincing</u> evidence to authorize pretrial detention when the question is whether any condition or combination of conditions "will reasonably assure the <u>safety of any other person and the community</u> . . .." (Latter emphasis added.)  By not requiring that same standard <u>vis</u> <u>a</u> <u>vis</u> an assessment of risk of flight, it is clear that a lesser standard--i.e., preponderance of the evidence--applied.  That is precisely the holding in the Second Circuit.  <u>See</u> <u>e.g.,</u> <u>United States v. Jackson</u>, 823 F.2d, 5 (D.C.Cir. 1987); <u>United States v. Berrios-Berrios</u>, 791 F.2d 246, 250 (2d Cir. 1986); <u>see</u> <u>also</u> <u>United States v. Patriarca</u>, 948 F.2d 789, 792 (1st Cir. 1991).

[3]  Section 3156 of Title 18 of the United States Code defines a crime of violence as:

(A)  an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another, or

4

(2)   involves an offense punishable by death or life imprisonment;

(3)   involves an offense prescribed by the Controlled Substances Act or the Controlled Substances Import and Export Act for which the maximum authorized punishment is imprisonment for ten years or more;[4] or

(4)   involves any felony alleged to have been committed after the defendant has been convicted of two or more crimes of violence, or of a crime, the punishment for which is death or life imprisonment, or a ten year [or more] offense under the Controlled Substances Act or the Controlled Substances Import and Export Act.

Additionally, the government or the court sua sponte may move for, or set, a detention hearing where there is a serious risk of flight, or a serious risk of obstruction of justice or threats to potential witnesses.  See 18 U.S.C. § 3142(f).

C.  In determining whether there are conditions of release

---

(B)  any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 3156(a)(4).

[4]  The maximum penalty is that provided by the statute defining and/or providing the punishment for the substantive offense--not the sentence, or even the maximum sentence, which might otherwise be imposed under the federal Sentencing Guidelines.  See United States v. Moss, 887 F.2d 333, 336-7 (1st Cir. 1989).

which will reasonably assure the appearance of the person and the safety of any other person and the community, this court must take into account:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
>
> (2) the weight of the evidence against the accused;
>
> (3) the history and characteristics of the person, including--
>
> > (A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> >
> > (B) whether, at the time of the current offense or arrest, he was on probation, on parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law; and
>
> (4) the nature and seriousness of the danger to any other person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).


D.  The burden of persuasion remains with the government to establish "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  The burden then rests on the defendant to come forward with evidence

6

indicating that these general findings are not applicable to him
for whatever reason advanced.  The government must satisfy its
position with respect to risk of flight by a preponderance of the
evidence and with respect to dangerousness by clear and
convincing evidence.  See supra footnote 3.  This court must then
weigh all relevant factors [set forth under § 3142(g)] and
determine whether "any condition or combination of conditions
will reasonably assure the appearance of the [defendant] as
required and the safety of any other person and the community."
The decision is an individualized one based on all relevant
factors.  United States v. Patriarca, 948 F.2d 789, 794 (
Cir. 1991); see United States v. Jessup, 757 F.2d 378, 387-88
(1st Cir. 1985).

Moreover, one may be considered a danger to the community
even in the absence of a finding by clear and convincing evidence
that the accused will engage in physical violence.  Conversely,
as noted by the Committee on the Judiciary (Report of the
Committee on the Judiciary, United States Senate), on S. 215.
98th Congress, Report No. 98-147 (May 25, 1983):

> The concept of defendant's
> dangerousness is described throughout
> this chapter by the term "safety of
> any other person or the community."
> The reference to safety of any other
> person is intended to cover the
> situation in which the safety of a
> particular identifiable individual,
> perhaps a victim or witness, is of
> concern, while the language referring

> to the safety of the community refers
> to the danger <u>that the defendant might
> engage in criminal activity to the
> detriment of the community</u>.  The
> Committee intends that the concern about
> safety be given a broader construction
> than merely danger of harm involving
> physical violence.... The Committee
> also <u>emphasizes</u> that the risk that a
> defendant will <u>continue to engage</u> in
> drug trafficking constitutes a danger to
> the "safety of any other person or the
> community."

<u>Id.</u> (Emphasis added; footnotes omitted); <u>see United States v.
Patriarca</u>, 948 F.2d 789, 792 n.2 (1st Cir. 1991) (danger to
community does not refer only to risk of physical violence); <u>see
also United States v. Tortora</u>, 922 F.2d 880, 884 (1st Cir. 1990)
(stating danger in context of 18 U.S.C. § 3142(g) not meant to
refer only to physical violence); <u>United States v. Hawkins</u>, 617
F.2d 59 (5th Cir. 1980), (trafficking in controlled substances).[5]

The issue critical to determining whether to detain a
defendant is therefore, whether, with respect to the defendant,
based on the guidelines set forth <u>supra</u> in part C of this Order,
any condition or combination of conditions of release exist that
will reasonably assure the safety of any person and the community
and the presence of the defendant.  18 U.S.C. § 3142(e).

---

[5] A defendant may be ordered detained as a danger to the safety of another or to the
community, however, only if the judicial officer determines that a detention hearing is
appropriate under the provisions of moved under 18 U.S.C. § 3142(f)(l), and the judicial officer
has determined that a hearing is appropriate under that latter section.  <u>See United States v. Ploof</u>,
851 F.2d 7 (1st Cir. 1988).

II.   The defendant, Khairullozhon Matanov, is 23 years of age.
He was born in Kyrgyzstan on October 4, 1990.  He entered the
United States through New York on May 26, 2010 and is a legal
permanent resident.  He has a valid passport from Kyrgyzstan.
Prior to entering the United States at the age of 19, the
defendant worked in Russia for a year.

     According to the Pretrial Services report, the defendant
graduated from high school in his native country and studied law
in college.  In addition, he participated in 30 days of military
training in anticipation of becoming a police officer.

     The defendant's 44 year old mother and 48 year old father,
who is reported to be in failing health, reside in Kyrgyzstan.
The defendant has four brothers.  His two younger brothers reside
in Kyrgyzstan and his two older brothers reside in Russia, where
they are working.  The defendant is single and has no children.
He has no relatives in the United States.

     For the 13 months prior to his arrest the defendant resided
in Quincy, where he shared an apartment with a roommate.  The
defendant contributed $1,000 to the monthly rent of $2,000.
Prior to living at his most recent address the defendant and his
roommate lived at another address in Quincy for a year.  The
defendant lived in Brighton with another roommate before moving
to Quincy.

     For the past two years the defendant has been employed as a

9

taxi diver for the Checker Cab Company in Braintree.  He worked for a Quincy taxi company for two months prior to going to work for Checker.  The defendant was employed in the kitchen of a Somerville restaurant prior to working as a taxi driver.

The defendant does not have a prior criminal record.

III.  The relevant evidence at the detention hearing showed the following.

The government called Special Agent James McElroy ("McElroy") of the Federal Bureau of Investigation ("FBI").  He testified that he has been so employed for the past 18 years and for the past decade he has been assigned to an organized crime squad.  Prior to joining the FBI McElroy was employed as a special agent with the Office of the Inspector General of the United States Department of Justice.

McElroy testified that he was involved in the investigation leading to the arrest of the defendant on the above-captioned charges.  He conducted surveillance of the defendant during the course of the investigation and participated in the arrest of the defendant.  McElroy explained that the FBI did not attempt to hide that it was surveilling the defendant in April of 2013.  On May 19, 2013 agents followed the defendant to the Boston University Dental Service.  The defendant approached one of the agents and asked some questions.  The surveillance "was not

covert in any manner," McElroy noted.  He added that on several
occasions the defendant executed "evasive driving styles."
Subsequently, out of a concern for public safety, the government
contacted the defendant's attorney, Attorney Glickman, and
requested that he advise the defendant to obey the traffic laws.

When asked about the defendant's ties to the United States
McElroy noted that the defendant is not a United States citizen
but has the status of a legal permanent resident.  McElroy added
that the defendant was employed as a taxi driver until the time
of his arrest.  The defendant's employer told agents that the
defendant will not have a job with his taxi company until the
above-captioned case is adjudicated.

In further testimony McElroy noted that the defendant does
not own any real estate in the United States nor does he own an
automobile or have any assets of record.  He added that the
defendant lives in a Quincy apartment with a roommate on a month
to month lease.  McElroy noted that the defendant has no family
members living in the United States.

McElroy was asked whether the government has conducted an
investigation relating financial transactions between the
defendant and individuals outside the United States.  McElroy
responded affirmatively.  He was shown two documents which he
identified as MoneyGram remitter forms.  He explained that
MoneyGram, like Western Union, is a service enabling individuals

to send money both domestically and internationally.  McElroy
noted that the forms, which were admitted as Government Exhibit
## 1 and 2, were found in a suitcase in the defendant's bedroom
closet pursuant to a consent search of the defendant's Quincy
apartment.  McElroy noted that the defendant's roommate had a
separate bedroom in the apartment.

According to McElroy, the government subpoenaed records from
MoneyGram and other money remitting entities seeking to determine
the identities of individuals outside the United States to whom
the defendant, using certain aliases, sent money between 2010 and
2013.  The FBI reviewed public data bases to ascertain the
identities of names used in the financial transmissions and
summarized the results of its inquiry in charts compiled by
Lindsay Zimmerman, a forensic accountant at the FBI.  McElroy
identified the charts, were admitted as Government Exhibit ## 3
through 5.

The charts identified the sender of the money, the recipient
of the money, the amount of money sent and the country to which
the money was sent.  According to McElroy, 114 transactions were
made in the name of the defendant or aliases traced to him.  He
added that 93 of the transactions, totaling $56,590.14, appear to
have been sent to family members of the defendant, while 21
transactions totaling $14,795.50 appear to have been sent to 15
unrelated individuals in six different countries including Egypt,

Greece, Jordan, Kyrgzstan, Uzbekistan and Turkey.

McElroy noted that there were no transactions between November of 2011 and July of 2012, the period of time when alleged Boston Marathon bomber Tamerlan Tsarnaev traveled to Dagestan.  McElroy added that the defendant told investigators that he speaks seven languages.

On cross examination it was established that on April 19, 2013 the defendant went to the Braintree Police Department, where he spoke with Detective Matt Heslam ("Heslam") and provided the detective with his contact information.  A transcript of the interview was admitted as Defendant's Exhibit # 1.  At the outset Heslam asked the defendant his nationality and the defendant replied, "Uzbek."  During the course of the interview the defendant told Heslam that he knew Tamerlan Tsarnaev.[6]  The defendant stated that he thought he met Tamerlan Tsarnaev at a mosque in Cambridge.  When asked if he had any "dealings" with the Tsarnaev brothers, his response was "No."  The defendant added that he played soccer with the Tsarnaev brothers.  Upon further questioning by Heslam the defendant stated that he had called Dzohokhar Tsarnaev earlier in the day but that the phone was "blocked or something."  Heslam contacted the FBI and the defendant was interviewed by the FBI on the following day.

---

[6] By that date photographs of Tamerlan Tsarnaev and his brother Dzhokhar had been publicly identified as suspects in the Boston Marathon bombing.

During his testimony McElroy referred to an FBI Form 302 dated April 20, 2013 summarizing an FBI interview with the defendant.  McElroy noted that he did not participate in the interview.  During the course of the interview the defendant told the FBI that he drove Tamerlan Tsarnaev to get his driver's license, that he often invited Tamerlan Tsarnaev to a restaurant, that he met the Tsarnaev parents and that he skyped with Tamerlan when Tamerlan was in Russia.  McElroy referred to another FBI Form 302 dated April 24, 2013 in which the defendant stated that he had seen Tamerlan Tsarnaev's wife and daughter in their home. McElroy added that on April 24, 2013 the defendant consented to a search of his residence, his car and a cellular telephone.

McElroy testified that on April 19, 2013 the defendant asked an individual identified as "Witness 3" to take several cellular telephones from him.  McElroy stated, "Matanov said they were illegal and they might be found if the FBI searched his apartment."  McElroy added that Witness # 3 refused to take the cellular telephones from the defendant.

In further testimony McElroy stated that the defendant admitted during the interview on April 20th that he called Tamerlan Tsarnaev shortly after the bombings and that he was at a restaurant with Tamerlan and Dzhokhar Tsarnaev on the Monday evening after the bombings.

On June 23, 2014 the matter of detention was reopened at the

request of the defendant.  The defense did offer any witnesses but instead proffered certain information in support of the defendant's argument for release.  In reference to the overseas money transfers defense counsel stated that $6500 went to the defendant's grandfather and that two of the recipients in Uzbekistan are cousins of the defendant.  Money was sent to Greece for a pizza shop owner, counsel stated.  He added that the defendant didn't use his own name on the money transfers in an effort to avoid tax problems.  Counsel stated that the defendant did not pay taxes.

Defense counsel added that he had located an apartment where the defendant could live alone if released by the court.  The apartment would be paid for with funds provided by the defendant's mother and currently deposited in defense counsel's IOLTA account.

IV.   The return of the Indictment in this case establishes the existence of probable cause that the defendant committed the crime for which he is charged in the Indictment.

The United States has moved for detention pursuant to 18 U.S.C. §§ 3142(f)(2)(A).  The government must demonstrate only by a preponderance of evidence that the defendant, if released, constitutes a serious risk of flight or failure to appear.  The two different standards are used because of the clear language

15

expressed in the last paragraph of 18 U.S.C. § 3142(f) which states "that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." Congress, by not attaching that language to the risk of flight clause, infers that a lower standard of proof is all that is necessary to establish the government's case.

A. Risk of Flight

The defendant is a 23 year old single man who was born in Kyrgyzstan and worked in Russia before coming to the United States four years ago at the age of 19.  Although a legal permanent resident of the United States, he remains a citizen and passport holder of Kyrgyzstan.  He has no family ties or assets in this country and appears to have been living a somewhat itinerant lifestyle first working in a restaurant and later as a taxi driver and not paying taxes.  In the last four years he has lived in at least three different locations in the Boston area with two different roommates.

The defendant's parents and two younger brothers remain in Kyrgyzstan while his two older brothers live and work in Russia. According to Defendant's Motion to Revoke Detention Order (Docket Entry # 49), a younger brother recently studied in Egypt.

By his own admission the defendant speaks seven languages.

The evidence offered at the detention hearing relating to more
than $70,000 in money transfers made by the defendant under
various assumed names indicates that the defendant has a wide
circle of friends and relatives in numerous countries around the
world including Egypt, Greece, Jordan, Turkey, Uzbekistan and his
native Kyrgyzstan.  The use of numerous aliases on the money
transfers suggests the defendant is familiar with the methods for
creating alternative identities which could facilitate his
ability to flee.  The presence of contacts around the world for
whom he has provided funds in the past could provide a network of
safe havens.

        Defense counsel's proposal that the defendant live alone in
an apartment and continue to work as a taxi driver provides no
guarantee that the defendant will appear as required.  The
government stated that the defendant's most recent employer would
not rehire the defendant during the pendency of this case.  A
review of the transcripts of the interviews of the defendant by
law enforcement agents suggests numerous inconsistent statements.
This court is also bothered by defendant's statement to Witness #
# 3 that he wanted to discard certain cellular telephones in
anticipation of a possible search by the FBI.

        If convicted the defendant faces a substantial period of
incarceration almost certainly followed by a revocation of his
legal permanent resident status and probable deportation.  This

only provides further incentive to flee.

The defendant did not proffer any credible evidence to detract from the government's argument that the defendant poses a serious risk of flight or failure to appear. Based on the totality of the evidence this court finds by a preponderance of the evidence that there is no condition or combination of conditions that will assure the appearance of the defendant as required.

V. <u>Conclusion</u>

This court has found, at least by a preponderance of the evidence, that there is no condition or combination of conditions that will assure the appearance of the defendant as required.

Having evaluated the factors set forth in 18 U.S.C. § 3142(g), this court orders the defendant detained subject to the following conditions:

> (1) The defendant be, and hereby is, committed to the custody of the Attorney General for confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal;

> (2) The defendant be afforded reasonable opportunity for private consultation with his counsel; and

> (3) On Order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the

defendant is confined deliver the defendant to an
authorized Deputy U.S. Marshal for the purpose of any
appearance in connection with a court proceeding.


      /S/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge