**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**KHAIRULLOZHON MATANOV,**<br><br>**Defendant.** | **Crim. No. 14-CR-10159-WGY** |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION**
**TO REVOKE DETENTION ORDER**

The Court should deny Defendant's Motion to Revoke Detention Order and instead

affirm Magistrate Judge Bowler's oral and written decisions to detain Mr. Matanov.

**I.     LEGAL STANDARDS**

The United States agrees with Mr. Matanov that this Court should review the detention

order *de novo* and that the United States bears the burden of proving by a preponderance of the

evidence that no condition or combination of conditions of release will reasonably assure Mr.

Matanov's appearance in court or that there is a serious risk that he will flee.[1]

**II.    FACTS**

Mr. Matanov was friends with Tamerlan Tsarnaev.   They discussed religious topics and

even hiked up a New Hampshire mountain in order to train like and praise the mujahideen.[2]

Mr. Matanov encountered the Tsarnaevs multiple times throughout the week following

the Boston Marathon bombings.  About 40 minutes after the bombings, Matanov called

---

[1] Def.'s Mot. to Revoke Detention Order ("Def.'s Mot.") at 4-5.

[2] Indictment ¶ 13.

Tamerlan and invited him to dinner.  Matanov drove the Tsarnaev brothers on the way to and

from the restaurant and paid for their meals.[3]  After that dinner, Matanov told Witness 1 that the

bombings could have a just reason, and continued to express support for them in the following

days.[4]  On April 17, 2013, Matanov called Tamerlan and Dzhokhar Tsarnaev multiple times.  He

never connected with Dzhokhar.  But he did speak to Tamerlan on multiple occasions, and

visited Tamerlan at his residence that evening.[5]  On April 18 and 19, 2013, Matanov saw the

pictures of the suspected bombers posted on the FBI's website and attempted to call Dzhokhar

twice more, without connecting.[6]

On the morning of April 19, 2013, Matanov became worried that law enforcement

investigators would start investigating him or his relationship with the Tsarnaev brothers.  To

head them off, Matanov went to the Braintree Police and gave them some information about the

Tsarnaevs.  Some of the information he gave was true.[7]  But some of it was false and misleading.

For example, Matanov falsely denied having seen the photographs released by the FBI the

previous night, and he minimized his contact with Tamerlan Tsarnaev and his wife and

daughter.[8]  He did so to limit investigators' interest in him, even going so far as to tell the

---

[3] Indictment ¶¶ 15, 45(b)-(c).

[4] Indictment ¶¶ 16-17.

[5] Indictment ¶ 18.

[6] Indictment ¶¶ 19-21.

[7] Indictment ¶ 29.

[8] Indictment ¶¶ 30-33.

Braintree police that his information would not assist the FBI, which he knew because he had studied law.[9]

The Braintree Police told Mr. Matanov, however, that the FBI would likely still want to talk to him.[10]  So after Matanov left the station, he asked Witness 1 to help him reformat his, Matanov's, computer, which would have deleted all of the computer's data.  Witness 1 refused.  So Matanov asked Witness 1 just to help him delete a few things.  Witness 1 refused again, saying that he would not delete any evidence that might be needed later on.  Matanov was unhappy with Witness 1.[11]

With Witness 1 unwilling to help him, Mr. Matanov deleted his computer files himself, and to great effect.  Matanov deleted data concerning his past Internet searches and website viewing history, including some that were related to news about the bombings and the search for the bombers.[12]  He also deleted about 1,300 other files, some of which contained violent content or calls to violence.[13]  Although Matanov allowed the FBI to search that computer, the deletions impeded the FBI's investigation by requiring personnel to spend considerable resources determining when the files were deleted and what they contained.[14]

---

[9] Indictment ¶ 34.

[10] Indictment ¶ 35.

[11] Indictment ¶ 38.

[12] Indictment ¶ 40.

[13] Indictment ¶¶ 41-42.  Ironically, Matanov missed deleting the "Downloads" folder that included pictures taken of himself and Tamerlan Tsarnaev apparently during their New Hampshire training hike.  That folder and those pictures were found intact.

[14] Indictment ¶ 43.

Despite Mr. Matanov's initial protestations of ignorance, the FBI *was* interested in talking to Matanov, as the Braintree Police had predicted.  They talked to him on April 20, April 24, April 25, April 27, May 3, May 31, and July 8, 2013.[15]

The FBI kept interviewing and reinterviewing Matanov because his story was important, and also because it kept changing.  For example, on the night after the bombing, Matanov had dinner with the Tsarnaevs at a restaurant.  Matanov initially made it seem as if they had met by chance.  To keep up the pretense, he even denied having given the Tsarnaevs a ride that night.  But in fact Matanov had invited Tamerlan to the restaurant and had driven both Tsarnaevs to and away from the restaurant.[16]  Matanov also told changing stories about when he suspected that the Tsarnaevs were the bombers and with whom he had discussed his suspicions.[17]  He did this because he wanted to divert the FBI from talking to Witness 1, because Matanov had discussed his suspicions about the Tsarnaevs with Witness 1 early in the morning of Friday, April 19, 2013; had told Witness 1 that the bombings would be justified if done by the Taliban or in the name of Islam; and had asked Witness 1 for help in deleting information from his computer.[18]  And Matanov lied about whether he had watched video files stored on his computer, because he knew that some of them contained violent content and calls to violence,[19] which might turn the

---

[15] Indictment ¶¶ 44-52.

[16] Indictment ¶¶ 45, 50.  This is the basis of Count 2.

[17] Indictment ¶¶ 46, 51.  This is the basis of Count 3.

[18] Indictment ¶¶ 16, 23, 38.

[19] Indictment ¶¶ 42, 43, 47, 52.  This is the basis of Count 4.

attention of the FBI's investigation onto Matanov's potential for a conspiracy with the

Tsarnaevs.

Mr. Matanov is a 23-year-old Kyrgyz citizen who entered the United States in 2010 and

is a lawful permanent legal resident.[20]  He has no family, real property, or significant assets in

the District of Massachusetts, let alone the United States.[21]  At this point, he does not have a

job.[22]

Mr. Matanov has significant contacts overseas.  He holds a valid Kyrgyz passport.  He

speaks seven languages: English, Kyrgyz, Russian, Uzbek, Turkish, Turkmen, and Kazakh.  He

comes from a large family, consisting of his parents, four other siblings, and other relatives, all

of whom live overseas.[23]

Mr. Matanov has a large circle of family and friends throughout the world to whom he

feels close enough to give or loan money.  Between 2010 and 2013, Matanov made 114 money

transfers.[24]  In total, he sent $71,385.91 to 15 different recipients, located in six countries besides

the United States: Kyrgyzstan, Egypt, Uzbekistan, Jordan, Turkey, and Greece.[25]  Matanov

transferred funds overseas to his parents,[26] his grandfather,[27] his cousins,[28] his younger

---

[20] Def.'s Mot. at 3.

[21] Detainment H'g and Arraignment Tr. at 10:13-11:9 (June 4, 2014).

[22] *Id.* at 10:4-6.

[23] *See* Def.'s Mot. at 3; Detention H'g Tr. at 4:24-5:21 (June 23, 2014).

[24] Detainment H'g and Arraignment Tr. at 18:21-22, 19:23-25 (June 4, 2014).

[25] Detainment H'g and Arraignment Tr. at 20:3-5, 22:8-9, 59:1-3 (June 4, 2014).

[26] Def.'s Mot. at 5.

brother,[29] and to friends who needed money to buy a car, to pay college tuition, and to start a business.[30]

Mr. Matanov made these transfers not just in his own name, but also under multiple aliases.[31] He used aliases because "someone told him that he shouldn't use his real name because it could cause tax problems for him so he came up with some fake names that he used."[32] The United States does not now claim that these funds came from illegal activities or were intended to promote illegal activities, other than, perhaps, tax evasion.[33] But Mr. Matanov's family members or friends could serve as potential resources and conduits, giving him the ability to flee should his detention be revoked.

It is true that Mr. Matanov did not flee in the year during which the United States investigated him, and that he wisely avoided Boston during certain holidays after being cautioned that he would be under heavy surveillance.[34] But he did try to evade the surveillance

---

[27] Detention H'g Tr. at 5:9-13 (June 23, 2014).

[28] *Id.* at 5:14-21.

[29] Def. Mot. at 5-6.

[30] Detention H'g Tr. at 6:23-7:3 (June 23, 2014).

[31] Detainment H'g and Arraignment Tr. at 19:23-25, 22:14-19 (June 4, 2014); Detention H'g Tr. at 7:4-7 (June 23, 2014).

[32] Detention H'g Tr. at 7:4-9.

[33] Although the money transfers ceased during Tamerlan Tsarnaev's six-month trip to Dagestan, Detainment H'g and Arraignment Tr. at 23:14-22 (June 4, 2014), the United States does not know why.

[34] Detainment H'g and Arraignment Tr. at 6:20-9:21 (June 4, 2014).

early on, [35] and given the changing nature of the facts he chose to give law enforcement, may

have felt that he had adequately placated the government.  And his incentives to flee have

increased, now that he faces federal charges whose maximum statutory terms of imprisonment

range up to twenty years and whose sentencing guidelines range well above two hundred

months.

## III.    ARGUMENT

Mr. Matanov should be detained pending trial because the charges are well-founded, he

has significant incentives to flee, he lacks significant ties to the community, and he has a

significant network overseas.  Conditions of release would be inadequate because they would

require Matanov to deal with Pretrial Services honestly, yet he is charged with dealing with

government officials dishonestly.

## A.    Matanov's False Statements and Computer Deletions Were Significant and Material

Mr. Matanov's primary complaint is that his false statements and computer deletions

were not material to the investigation of the Boston Marathon bombings.

They were material.  "The test of materiality is whether the [fact] in question had a

natural tendency to influence, or was capable of influencing, a government function." [36]  A

defendant's answer can be material even if the government did not rely on it, as long as the

government might have done so:  "if a statement could have provoked governmental action, it is

---

[35] Detainment H'g and Arraignment Tr. at 7:8-8:20 (June 4, 2014).

[36] *United States v. Sebaggala*, 256 F.3d 59, 65 (1st Cir. 2001) (defining materiality in false statement prosecution under 18 U.S.C. § 1001(a)(2)).

material regardless of whether the agency actually relied upon it."[37]  "Thus, the proper inquiry is

not whether the tendency to influence bears upon a particular aspect of the actual investigation

but, rather, whether it would bear upon the investigation in the abstract or in the normal

course."[38]  A fact is especially material if it is intended to misdirect government investigators or

to cut off their line of inquiry.[39]

Here, Mr. Matanov's efforts to conceal aspects of his relationship with, contacts with,

and sympathy for the Tsarnaevs were material.  A witness's information about the "whereabouts

and activities" of a suspected terrorist is material.[40]  Here, the investigators' questions went right

---

[37] *Sebaggala*, 256 F.3d at 65 (false statements prosecution under 18 U.S.C. § 1001).  *Cf. especially United States v. Mehanna*, 735 F.3d 32, 54-55 (1st Cir. 2013) (rejecting defendant's argument that false statements prosecuted under 18 U.S.C. § 1001 cannot be material if the government already knew the true answers to the questions that they posed defendant and to which he lied), *pet. for cert. filed* (Mar. 17, 2014).

[38] *Mehanna*, 735 F.3d at 54 (false statements prosecution under 18 U.S.C. § 1001).

[39] *Cf. id.* at 55 ("To cinch matters, the defendant's mendacity was undertaken for the purpose of misdirecting the ongoing FBI investigation (or so the jury could have found).  This is an important datum:  where a defendant's statements are intended to misdirect government investigators, they may satisfy the materiality requirement of section 1001 even if they stand no chance of accomplishing their objective.  This principle makes eminently good sense: it would stand reason on its head to excuse a defendant's deliberate prevarication merely because his interrogators were a step ahead of him.") (citation omitted); *United States v. Mubayyid*, 658 F.3d 35, 74 & n.42 (1st Cir. 2011) (noting that evidence to convict defendant under 18 U.S.C. § 1001(a)(2) was "simply overwhelming" because defendant's false statements effectively cut off FBI agent's line of inquiry at an interview and the agent testified that had the defendant answered the question truthfully, "it would have drastically changed the course the interview took" and the agent would have asked an entire line of additional questions) (internal quotation marks omitted).

[40] *See Mehanna*, 735 F.3d at 54 ("The statements on which this count depends pertain to the whereabouts and activities of the defendant's friend and compatriot, Maldonado."); *id.* at 55 ("In the case at hand, it is clear beyond hope of contradiction that the defendant's false statements about Maldonado had a natural tendency to influence an FBI investigation into terrorism.  After all, Maldonado was hip-deep in terrorism-related antics.  During the critical interview, the

to the heart of the Tsarnaevs' whereabouts and activities, in order to determine (a) who, if anybody, had conspired with the Tsarnaevs; (b) where the Tsarnaevs had been both before and after the bombing; (c) what evidence could locate or prosecute Dzhokhar; (d) the Tsarnaevs' respective roles in planning and executing the bombing; and (e) how the Tsarnaevs decided to bomb the Marathon.  Although Matanov may or may not have known less about the Tsarnaevs and their plans than did Mehanna about Maldonado, Matanov's attempts to conceal information about the Tsarnaevs and his dealings with and knowledge of them are no less material.

Consequently, the grand jury was correct when it determined that Mr. Matanov's false statements and deletions were material.  The grand jury explicitly found that "[d]uring the investigation, which continued after Dzhokhar Tsarnaev's arrest, it was material to collect all available evidence and identify all witnesses related to the bombings and the bombers' movements, and to determine, among other things, (a) who, if anyone, had conspired with the Tsarnaevs; (b) where the conspirators had been, and with whom they had met, before and after the bombings; (c) each of the conspirators' roles in planning and executing the bombings; (d) how the conspirators decided to bomb the Marathon; (e) the identities of any individuals with whom the conspirators might have discussed terrorism; (f) the nature and the extent of those individuals' friendship, contact, and communication with the conspirators; and (g) any

---

defendant was plainly attempting to obscure both Maldonado's participation in terrorist endeavors and the telephone call in which he and Maldonado had discussed jihad and terrorist training.  The misinformation imparted by the defendant thus had a natural propensity to influence an FBI investigation into terrorist activity.").

information and views that those individuals held related to terrorism and the conspirators."[41]

The grand jury then found that under this definition, Matanov's false statements were material.[42]

The grand jury was correct.  There were ample grounds to investigate whether Mr. Matanov had conspired with the Tsarnaevs or might have known whether anyone else did:  he called Tamerlan about 40 minutes after the bombings, had dinner with both Tsarnaevs the night after the bombings, contacted and attempted to contact both of them throughout the week after the bombings, visited Tamerlan Tsarnaev's house that week, shared Tamerlan Tsarnaev's views about political violence, and had voiced support for the bombings.  Even if Mr. Matanov himself had not conspired with the Tsarnaevs — and the United States is not now claiming that he did — there were ample grounds to investigate whether Matanov knew who had conspired with them or merely whether he had information about their plans for the bombings or for escape.

Consequently, it was material, as discussed in Count 2, whether Matanov's meeting the Tsarnaevs at the restaurant was accidental or planned and whether they drove together or separately.  With these details, the agents could have questioned more closely not only the Tsarnaevs' whereabouts after the bombing, but also Matanov's observations of their condition, thoughts, contacts with others, contacts with places at which they might have stowed evidence or other materials for explosives, and whether Matanov himself had been privy to their plans before or after the bombings.

It was also material, as discussed in Counts 1 and 4, whether Matanov had kept, watched, and deleted certain files on his computer:  Matanov himself recognized the files' materiality

---

[41] Indictment ¶ 11.

[42] *See* Counts 2 through 4.  Count 1 does not have a materiality element.  But even if it did, it would be satisfied.

when he asked Witness 1 to help him delete them and when he then deleted them himself.  With

these details, especially some of the files' violent nature, the agents could have questioned more

closely the extent to which Matanov had discussed or planned violent action with the Tsarnaevs,

whether he had received violent files from them, whether the Tsarnaevs had viewed similar files,

and from whom they had received such files.  The deletions obstructed the FBI's investigation by

requiring personnel to spend considerable resources determining when the files were deleted and

what they contained.  (Matanov has suggested that causing the FBI to expend extra time and

resources on his computer is not obstruction.  But spending extra time and resources on an

investigation is the *very essence* of obstruction.)

And it was finally material, as discussed in Count 3, whether Matanov told changing

stories about when he suspected that the Tsarnaevs were the bombers and with whom he had

discussed his suspicions.  He did this to divert the FBI from talking to Witness 1.  Why?

Because Witness 1 was the person to whom Matanov justified the bombings if done by the

Taliban or in the name of Islam, with whom Matanov had discussed his suspicions about the

Tsarnaevs early in the morning of Friday, April 19, 2013, and from whom Matanov had

requested help in deleting information from his computer.

Mr. Matanov claims that the prosecution is not well-founded because his religious views,

his political views, and his video preferences are protected by the First Amendment.  This is a

red herring.  Of course they are protected by the First Amendment.  But the First Amendment

does not prevent the United States to consider whether his religious and political views and his

video-watching preferences shed light on his probable connection and activities with the

Tsarnaevs and his knowledge of their potential co-conspirators.

Mr. Matanov also claims that the prosecution is not well-founded because he provided some truthful information. This is also a red herring. Providing some pieces of truthful information did not give Matanov license to lie about others. Once Mr. Matanov started talking to the government, he had an obligation to tell the truth.[43] Failing that, he could have exercised his right to remain silent. But telling lies was not a lawful option.

## B.    Ties to the Community and Incentives to Flee

The crux of the argument for detention lies in Mr. Matanov's lack of ties to the community and his incentives to flee. The argument is mere recitation of the facts: he is a young taxi-driver with no family, real property, or significant assets in the District of Massachusetts, let alone the United States. Although he now has an apartment at which he can stay, he has no job. He could safely go overseas, because he speaks seven languages and has significant contacts overseas who would likely welcome him, especially the 15 people to whom he has given or lent about $71,385.91 in six countries besides the United States. Even if these funds were innocent and charitable, they give multiple recipients reason to give him safe haven.

Whatever motivations kept Mr. Matanov in the United States before indictment have diminished after indictment, now that he faces federal charges with high sentencing guidelines.

---

[43] *See United States v. Stewart,* 433 F.3d 273, 318 (2d Cir. 2006) (holding, in prosecution for violating § 1001(a)(1), that "sufficient evidence of materiality and intentionality also existed for the jury to convict Bacanovic on the basis of concealment. The essential issue is whether Defendant knowingly and willingly falsified, concealed, or covered up information relevant to the investigation. *Defendant's legal duty to be truthful under section 1001 included a duty to disclose the information he had regarding the circumstances of [Martha] Stewart's December 27th trade, even though he voluntarily agreed to speak with investigators.*") (emphasis added); *United States v. Moore,* 446 F.3d 671, 680 (7th Cir. 2006) (holding, in prosecution for violating § 1001(a)(1), that "[o]nce a person begins to provide information, as Moore did as she strove to salvage WH's grants, she must 'refrain from telling half-truths or from excluding information necessary to make that person's statement accurate'") (quoting jury instruction upheld by court).

**C.      Conditions of Release Will Be Inadequate**

Mr. Matanov proposes conditions of release.  Granted, those conditions would be sensible if he were released.

But the proposed conditions are nonetheless insufficient.  The conditions would work only if Mr. Matanov could be entrusted to deal with Pretrial Services honestly and consistently at the risk of his flight.  But he cannot.  He is charged with repeatedly lying to government agents. Reinforcing the conclusion that his past predicts the future is Mr. Matanov's having repeatedly sent money overseas using false names to suit his own ends.  They suggest, at least by the preponderance of the evidence, that he will deal with Pretrial Services dishonestly when it is to his advantage.

Thus, although the types of conditions that Mr. Matanov proposes might be appropriate for another young defendant without significant ties to the community and with safe havens abroad, they are inappropriate for Mr. Matanov.

**IV.      CONCLUSION**

For all these reasons, Mr. Matanov's motion for release should be denied and Magistrate Judge Bowler's decision to detain him should be affirmed.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney
District of Massachusetts

By:     */s/ Scott L. Garland*
        Scott L. Garland
        Aloke S. Chakravarty
        Assistant U.S. Attorneys

## **CERTIFICATE OF SERVICE**

I hereby certify that this document is being filed through the ECF system, and therefore will be sent electronically to the registered participants as identified on the Notice of Electronic Filing

*/s/ Scott L. Garland*
Scott L. Garland
Assistant U.S. Attorney

Date: August 11, 2014