```
 1                 UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3                              No. 1:14-cr-10159-WGY

 4

 5

 6    UNITED STATES OF AMERICA

 7

 8    vs.

 9

10    KHAIRULLOZHON MATANOV

11

12

13
                              *********
14

15                     For Hearing Before:
                       Judge William G. Young
16

17
                       United States District Court
18                     District of Massachusetts (Boston)
                       One Courthouse Way
19                     Boston, Massachusetts 02210
                       Friday, December 19, 2014
20

21                           *******

22
                  REPORTER: RICHARD H. ROMANOW, RPR
23                      Official Court Reporter
                       United States District Court
24        One Courthouse Way, Room 5510, Boston, MA 02210
                       bulldog@richromanow.com
25
```

```
 1                  A P P E A R A N C E S

 2

 3   SCOTT GARLAND, ESQ.
     ALOKE CHAKRAVARTY, ESQ.
 4      United States Attorney's Office
        J. Joseph Moakley U.S. Courthouse
 5      1 Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
 6      (617) 748-3664
        Email: Scott.garland@usdoj.gov
 7      For the United States

 8
     PAUL GLICKMAN, ESQ.
 9   STEPHANIE Y. MARZOUK, ESQ.
        Glickman Turley, LLP
10      Faneuil Hall Marketplace
        1 South Market Building, 4th Floor
11      Boston, Massachusetts 02109
        Email: Pmg@glickmanturley.com
12      For the defendant

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              P R O C E E D I N G S
2          (Begins, 2:00 p.m.)
3          THE CLERK:  Now hearing Criminal Matter 14-10159,
4    the United States of America versus Matanov.
5          THE COURT:  Before I call on counsel I want to
6    acknowledge the presence of two of our colleagues from
7    the courts of South Korea and we're honored to have them
8    here and to be part of our proceedings.
9          Now would counsel identify themselves.
10         MR. GARLAND:  Good afternoon, your Honor, Scott
11   Garland on behalf of the United States.
12         MR. CHAKRAVARTY:  Aloke Chakravarty for the United
13   States.
14         MR. GLICKMAN:  Paul Glickman for the defendant,
15   Mr. Matanov.
16         MS. MARZOUK:  Stephanie Marzouk for the defendant.
17         THE COURT:  All right.
18         Now, Mr. Glickman, this is your motion, but I want
19   to start at a higher level of generality because I need
20   some help and I guess my first question goes to the
21   government.
22         I've read the article in question and I'm familiar
23   with the type of document, these 306s.
24         It's fair to say that internally, in the FBI,
25   those are supposed to be kept confidential, correct?
```

1   MR. GARLAND: That's true, but they are turned
2   over to defense during discovery, um, at various times.
3   But, yes, within the --
4   THE COURT: At various times. Is that the routine
5   practice?
6   MR. GARLAND: For discovery? Yes. I mean
7   sometimes it's Jencks material, sometimes it's --
8   THE COURT: I see. I go back long enough where
9   your office wasn't turning them over. But that's
10  neither here nor there.
11  MR. GARLAND: And sometimes we give it just as a
12  courtesy, um, as was done in this case, to help the
13  defense --
14  THE COURT: Now that's -- now you're actually
15  coming right to it.
16  So in this case, having looked at that article,
17  those 30 --
18  Um, 302s, right?
19  MR. GARLAND: 302s, yes, your Honor.
20  THE COURT: 302s. I said 306s.
21  Those 302s were turned over to whom?
22  MR. GARLAND: To then defense counsel.
23  THE COURT: Mr. Hayden?
24  MR. GARLAND: That's correct.
25  THE COURT: Can you give me some idea when?

1          MR. GARLAND:  It would have been the night before,
2     or I believe the -- the afternoon before the detention
3     hearing.
4          THE COURT:  All right.
5          So, Mr. Glickman, now it's fair to start with you.
6          What sort of investigation have you done to find
7     out who, on the defense team, had access to it?
8          MR. GLICKMAN:  I have asked Mr. Hayden.  Um, at
9     the time of the article, shortly after the article I
10    spoke directly to Mr. Hayden.  He told me that he had
11    not disclosed the 302s to anyone outside of the people
12    who were authorized to do so, including the investigator
13    and the defendant himself.  I don't know if he -- I
14    don't believe, but I'm not 100 percent sure whether he
15    gave the 302s to the defendant.  I do know that, having
16    spoken to him, he says he did absolutely not -- he
17    actually had not disclosed them.  I asked --
18         THE COURT:  Well, that's the ultimate question.
19    Let's start figuring out who had access to it.
20         MR. GLICKMAN:  And the other person who had access
21    to them was the investigator, Sarah Houkman.
22         THE COURT:  So, um -- so you have them now?
23         MR. GLICKMAN:  Yes, I have them now.
24         THE COURT:  But that's subsequent to the article
25    when you --

1        MR. GLICKMAN:  Um --

2        THE COURT:  Because you were cooperating with

3   Mr. Hayden.

4        So when did you first see them?

5        MR. GLICKMAN:  I did not see them until I was

6   appointed because of an issue with regard to the

7   protective order.

8        THE COURT:  Okay.

9        MR. GLICKMAN:  So that I didn't look at -- I had

10  no access to the --

11       THE COURT:  And that was after the article, when

12  you were appointed?

13       MR. GLICKMAN:  Let's see.  The date of the article

14  was December -- yes, it was after I was appointed.

15       THE COURT:  Okay.  So Mr. Hayden had them.  The

16  investigator who you named had them.

17       You don't know whether Mr. Matanov himself had

18  them?

19       MR. GLICKMAN:  I don't know for sure.  I don't

20  think he did, but I'm not 100 percent sure.  And the

21  other person who did have them was the, um, computer

22  expert that Mr. Matanov initially retained.

23       THE COURT:  All right.

24       Now, if he had them, when you say "he," your

25  client had them, does that mean they were left with his

1   legal papers at Plymouth where he was detained?
2           MR. GLICKMAN:  No, he eventually, when we were
3   appointed, sent us all his legal papers.
4           THE COURT:  No, so when he sent them to you, were
5   those 302s among them?
6           MR. GLICKMAN:  Well, this is a -- I don't believe
7   so, but I'm not 100 percent sure.  I'd have to go back
8   and check.
9           THE COURT:  No, and your caution is correct.
10          MR. GLICKMAN:  I did inquire though whether he had
11  provided them to anyone, and he had said absolutely not.
12          THE COURT:  Well, but that doesn't mean that they
13  -- that access to them was forbidden to the guards who
14  have the right to search materials and the like, does
15  it?
16          MR. GLICKMAN:  I think that's fair to say.
17          THE COURT:  If he had them.
18          MR. GLICKMAN:  That's fair to say.
19          THE COURT:  So among the, um -- I don't need to
20  have names at least at this stage.
21          So who had them within the U.S. Attorney's Office?
22          MR. GLICKMAN:  You're not asking me to --
23          THE COURT:  No, I'm shifting now to the
24  government.
25          MR. GARLAND:  Your Honor, that would probably be

1   the members of the unit that is doing the Boston
2   Marathon bombings investigation.
3         THE COURT:  Right.  How about up the ladder, the
4   U.S. Attorney, the First Assistant --
5         MR. GARLAND:  I don't know the answer to that,
6   your Honor.
7         THE COURT:  And I'm not asking as of today.
8         So -- and I don't mean to compromise any of your
9   internal procedures, but it's appropriate to ask.  I
10  take this very seriously.
11        So what sort of "security," if you will, as a
12  matter of procedure was in place among that team?
13        MR. GARLAND:  All of our internal offices have key
14  pads, so that to get into my office it's -- the door
15  locks automatically and to get in you either have to
16  have a key -- and in fact at the time we didn't even
17  have a key for that door, um, you'd have to have the
18  combination to the key pad.  And then the actual office
19  wing itself has a key pad outside that requires access
20  as well with particular electronic measures.
21        THE COURT:  Okay.  And on your staff you have a
22  secretary who has access, who has access just as a
23  practical matter?
24        MR. GARLAND:  I would say any of the support staff
25  would as well.  Could have access.

```
 1              THE COURT:  Right.  "Could."
 2         So when you say "team," you're referring to the,
 3    um, the team working on this case and their support
 4    staff?
 5              MR. GARLAND:  That would be correct.
 6              THE COURT:  All right.
 7         Then to your knowledge, and I'm not asking whether
 8    you've worked this all out yet, but to your knowledge
 9    what's the procedure within the FBI with respect to
10    these things, do you know?
11              MR. GARLAND:  I don't know but I think they would
12    keep all of that information confidential and try to
13    keep it out of the public because it contains lots of
14    sensitive information about these investigations related
15    that we don't want to get out.
16              THE COURT:  Right.
17         All right.  Here's what I propose, and we'll start
18    with the defense.
19         Mr. Glickman, I want you to do an investigation as
20    to who on the defense team had access, um, and I want it
21    in writing what your conclusions are.  And then with
22    respect to all of those individuals who you have
23    identified, I want an undertaking in writing, under the
24    pains and penalties of perjury, and I want reference
25    made to 18 United States Code, Section 1001, because
```

1  this is an appropriate investigation that invokes that
2  statute, I want an undertaking by each of those people,
3  including your client, if he had access, that he has not
4  turned them over or made them accessible to this
5  journalist.
6       And I want the same thing from the government.  I
7  want the government to engage in an internal
8  investigation, but I leave the parameters to counsel.
9  I'm not impugning anyone.  But I want in writing, in my
10 case, um, an investigation -- so far as you can tell a
11 reasonable investigation is who had access to this, both
12 the support team and superiors, if superiors did, um,
13 the lawyers, the support team, the superiors if they had
14 access, and then I want the investigation to include the
15 people in the FBI who had access, and I want
16 undertakings in exactly the same terms, that they were
17 not turned over.  Everyone has the rights that they have
18 under the Fifth Amendment and if those rights are
19 claimed, we'll see.
20      How long will it take to do this, Mr. Glickman, on
21 your part?
22      MR. GLICKMAN:  I am hoping to be away in New York
23 next week.
24      THE COURT:  I'm not pressing.
25      MR. GLICKMAN:  So by January --

1        THE COURT:  Here's my view.  Here's my view.
2   What's done is done.  We have to deal with that.
3        The journalist has a qualified privilege.  We're
4   not close to trenching on that yet, because maybe we can
5   find out, reasonably, another way.  There's another
6   layer to this.  If you find out that Mr. Matanov himself
7   retained possession of the documents while incarcerated,
8   I may broaden the investigation to the marshal service
9   and those people who had access to his cell in Plymouth.
10  That's a way that these things could have been
11  disseminated.  But I need not go there unless you find
12  out he actually retained access.  If Mr. Hayden took it
13  into the prison and took it out, and there was only one
14  copy, well, then that's fine.
15       So how long do you want?
16       MR. GLICKMAN:  I think, given the holidays, we
17  have these two weeks -- it's short.  January 15th, that
18  Friday?
19       THE COURT:  So I can have your report by the 15th?
20       MR. GLICKMAN:  Yes.
21       And one other point I do want to make is that your
22  Honor mentioned the investigation would be various FBI
23  agents.  I just wanted the Court to know that, in their
24  own papers, that it's more than the FBI, it's the whole
25  joint terrorism task force.  So there may be police

```
 1   officers and --
 2         THE COURT:  There may be.  I think the government
 3   understands.
 4         MR. GLICKMAN:  Yes.  Thank you.
 5         THE COURT:  So more people legitimately had access
 6   to it, on the part of the government, but they had a
 7   professional obligation not to disclose, and for
 8   starters we're going to assume that that was followed.
 9         How long to get such a report and such
10   undertakings?
11         MR. GARLAND:  Um, I'm going to have to think about
12   that, your Honor, because there are -- obviously because
13   the 302s are kept inside a database there could be
14   access by our people outside of Boston.
15         THE COURT:  Is any record made of that?
16         MR. GARLAND:  I would have to check with the FBI
17   about what records they have about that.
18         THE COURT:  Well, I want the -- so why don't we
19   say by February 1 for you because you have an added
20   obligation?
21         MR. GARLAND:  Yes, thank you, your Honor.
22         THE COURT:  All right.
23         MR. GARLAND:  The other thing I wanted to raise is
24   that, um, although this is not a subject on which I'm
25   very expert on, I know that there are some rules and
```

```
 1   regulations that bind the Justice Department and when

 2   its employees can testify in court.  I would like to

 3   make sure that if there's any way to --

 4           THE COURT:  I'm not -- of course.

 5           MR. GARLAND:  Thank you, your Honor.

 6           THE COURT:  And while I -- as I've said, I surely

 7   respect the Fifth Amendment rights of anyone who may be

 8   caught up in the Court's inquiry here, likewise I will

 9   consider such matters, but it's your obligation now to

10   bring them to my attention.

11           This is a very serious matter.  I draw no

12   conclusions whatsoever.  But appropriately I want to

13   know what happened here.  And, um, so that appropriate

14   action can be taken.  But I should say no more, nor will

15   I.

16           So of course your rights to bring that to my

17   attention are -- I'm not overruling them in any way

18   because they haven't been framed yet, and I think the

19   first step is to get on the record that people say,

20   "Well, I didn't do it," and say it under oath or claim

21   their Fifth Amendment rights.

22           All right.  Thank you very much.

23           We'll call the next case.

24           (Ends, 2:10 p.m.)

25
```

1    C E R T I F I C A T E

4       I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,
5    do hereby certify that the foregoing record is a true
6    and accurate transcription of my stenographic notes,
7    before Judge William G. Young, on Friday, December 19,
8    2014, to the best of my skill and ability.

/s/ Richard H. Romanow   01-06-15
12   _____
RICHARD H. ROMANOW   Date